**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

|  |  |  |
|---|---|---|
| TERA M. BRUNER-McMAHON, as | ) | |
| Administrator of the Estate of | ) | |
| TERRY ALBERT BRUNER, Deceased, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION |
| v. | ) | |
| | ) | No. 10-1064-KHV |
| ROBERT HINSHAW, | ) | |
| Sedgwick County Sheriff, et al., | ) | |
| | ) | |
| Defendants. | ) | |

_____

**MEMORANDUM AND ORDER**

The administrator of the estate and the children of Terry Albert Bruner, a former inmate at

the Sedgwick County Adult Detention Facility in Wichita, Kansas, filed suit under 42 U.S.C. § 1983

to recover money damages for the violation of Bruner's rights under the Eighth Amendment.  In

particular, plaintiffs allege that various individuals associated with Sedgwick County, Kansas (the

"Sedgwick County Defendants") and ConMed, Inc. (the "ConMed Defendants") were deliberately

indifferent to Bruner's serious medical needs.[1]  This matter is before the Court on ConMed

_____

[1]      On October 12, 2011, the parties stipulated to the dismissal without prejudice of plaintiffs' claims against the County of Sedgwick, the Sedgwick County Sheriff's Department and Gary Steed in his official capacity.  See Partial Stipulation Of Dismissal (Doc. #277).  They further stipulated to the dismissal with prejudice of plaintiffs' claims against Eric Hunt, Joseph R. Hunter, Erica Johnson-Wootson, Janis Jones, Glenn Kurtz, Keith J. Lovingier, Henry A. Tong, Sharon Nelson and Vickye D. Beasley.  See id.  In addition, the parties agreed that defendant FNU Tolan should be dismissed because plaintiffs did not obtain personal service on that defendant.  See Pretrial Order (Doc. #294) at 3.  The remaining Sedgwick County Defendants are Robert Hinshaw in his official and individual capacities, Gary Steed, Wayne E. Brown, Mark B. Cook, Rhonda M. Freeman, Rachel M. Gaines, Ted Gibson, Bobby L. Hines, Marque Jameson, Timothy McMahon, Faustino Martinez, Michael Murphy, Lisa M. Perez, Gerald Pewewardy, Lisa R. Price, Daniel M. Safarik, Jared O. Schecter, Abdul S. Smith, Mary Staton, Robert D. Taylor and Lisa Williams.  The remaining ConMed Defendants are ConMed, Inc., ConMed Healthcare Management, Inc., Lisa Armstrong, Joyce Beyrle, Charles Fletcher, Cassie Leu Looka, Kendra Maechtlen Wolff, Alicia Mefford and Andrea L. Skelton.

Defendants' Joint Motion For Summary Judgment (Doc. #269) and the Sedgwick County Defendants' Motion For Summary Judgment (Doc. #270), both filed September 23, 2011.  For reasons stated below, the Court sustains the summary judgment motion of the ConMed Defendants in its entirety.  The Court sustains the summary judgment motion of the Sedgwick County Defendants as to all claims and defendants except the claims of Tera Bruner-McMahon, as administrator of Bruner's estate, against Marque Jameson and Mary Staton.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving parties are entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."  Liberty Lobby, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of evidence.  Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991).  Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which she carries the burden of proof.  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  The nonmoving party may not rest on its pleadings but must set forth specific facts.  Applied Genetics, 912 F.2d at 1241.

The Court views the record in the light most favorable to the nonmoving party.  Deepwater

Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991).  It may grant summary

judgment if the nonmoving party's evidence is merely colorable or is not significantly probative.

Liberty Lobby, 477 U.S. at 250-51.  In response to a motion for summary judgment, a party cannot

rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment

in the mere hope that something will turn up at trial.  Conaway v. Smith, 853 F.2d 789, 794 (10th

Cir. 1988).  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to

require submission to the jury or whether it is so one-sided that one party must prevail as a matter

of law."  Liberty Lobby, 477 U.S. at 251-52.

## Factual Background

Plaintiffs have attempted to controvert nearly all of defendants' facts, but most of plaintiffs'

responses are insufficient for one or more of the following reasons:

> 1.  Many of plaintiffs' responses do not specifically address the substance of the
> matter asserted.  Plaintiffs repeatedly state that they deny the factual statement "in
> the manner and form alleged," see, e.g., Response To Sedgwick County Defendants'
> Statement Of Facts ¶¶ 4-6, 9-12, 14-19; Response to ConMed Defendants' Statement
> Of Facts ¶¶ 2-15, 17-27, without attempting to explain any deficiency in the manner
> and form of the statement or what portion of defendants' statement of fact that they
> admit and what portion that they deny.  Plaintiffs also attempt to controvert many
> facts with (1) the exact same summary of the case without explaining how that
> summary relates to the specific fact alleged [2] or (2) references to numerous additional

---

> [2]      For example, in response to the ConMed Defendants' statement of facts, plaintiffs
> repeat the following mantra some 25 times:
>
> There is testimony that Bruner clearly appeared to need medical attention since at
> least March 5, 2008 (Additional Material Facts, ¶¶ 1, 2, 3, 11, 12, infra); yet, when
> Bruner was returned to Sedgwick on March 6, 2008, specifically for medical
> attention at the Clinic, it is undisputed that Bruner did not receive any medical
> attention or treatment before he was taken to the Clinic on March 10, 2008 at
> approximately 3:21 p.m. ConMed failed to take any responsibility to ensure that the
> inmates returning from out of county to Sedgwick for medical treatment actually
> received the medical treatment. (Additional Material Facts, ¶¶ 13, 16, infra). As
> result, Bruner suffered through a prolonged process of dying. His manifestations
> began on March 5, 2008 and progressed until his ultimate death on March 12, 2008.
>
> (continued...)

facts without explaining how the additional facts relate to the specific fact alleged.[3] Plaintiffs' attempt to controvert facts in this manner is insufficient under D. Kan. Rule 56.1, which provides that all material facts set forth in the movant's statement shall be deemed admitted unless "specifically controverted" by the opposing party. Vasquez v. Ybarra, 150 F. Supp.2d 1157, 1160 (D. Kan. 2001) (citing Gullickson v. Sw. Airlines Pilots' Ass'n, 87 F.3d 1176, 1183 (10th Cir. 1996)). Under D. Kan. Rule 56.1(e) and basic principles of persuasion, a responding party has a duty to fairly meet the substance of the matter asserted.

2.   Plaintiffs attempt to controvert nearly every fact including facts to which they already stipulated.  Pretrial Order (Doc. #294) at 3-4;  see, e.g., Response To Sedgwick County Defendants' Statement Of Facts (Doc. #283) ¶¶ 4-6, Response to ConMed Defendants' Statement Of Facts (Doc. #285) ¶¶ 2, 5, 25.  Plaintiffs do not explain how they contest the stipulated facts.

3.   In support of several of their additional statements of fact, plaintiffs include lengthy factual assertions with no references to the factual record.[4]  See Plaintiffs' Additional Facts To ConMed Motion For Summary Judgment (Doc. #285) ¶¶ 44, 45, 46.  Under D. Kan. Rule 56.1(b), all factual statements shall refer with particularity to those portions of record on which the non-movant relies.  D. Kan. Rule 56.1(b); Fed. R. Civ. P. 56(c)(1) and (3); see United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."); Boldridge v. Tyson Foods, Inc., No. 05–4055–SAC, 2007 WL 1299197, at *2 (D. Kan. May 2, 2007) (duty of parties contesting motion for summary judgment to direct court to places in record where evidence exists to support their positions); Murray v. Edwards Cnty. Sheriff's Dept., 453 F. Supp.2d 1280, 1285 (D. Kan. 2006) (court will not consider non-movant's requested factual findings that do not include citations to admissible evidence).

_____

[2](...continued)
If Bruner had received appropriate medical treatment just a few hours earlier, more likely than not, his death would have been prevented. (Additional Material Facts, ¶¶ 39, 40, 41, 42, 43, infra).

Response To ConMed Defendants' Statement Of Facts (Doc. #285) ¶¶ 14, 15, 17-20, 27, 30-43, 45-48.

[3]      For example, Paragraph 41 of the Sedgwick County Defendants Statement Of Facts states that "Bruner never asked Cook to see a doctor or to go to the clinic, although he was able to respond to Cook's directions, answer and make intercom calls, dress himself and discuss how he had been and was feeling."  Doc. #271 at 21.  In response, plaintiffs refer to 32 additional facts which span some 11 pages of text without explaining how the additional facts controvert the specific facts alleged.  See Doc. #283 at 32.

[4]      In their reply filed November 10, 2011, defendants noted this deficiency, see Doc. #296 at 19-20, but plaintiffs have not asked to file a surreply or to otherwise supplement the record.

4. Plaintiffs attempt to controvert many facts by arguing that they are "incomplete." See, e.g., Response To Sedgwick County Defendants' Statement Of Facts (Doc. #283) ¶¶ 5, 6, 10, 11, 16-19; Response To ConMed Defendants' Statement Of Facts (Doc. #285) ¶¶ 3, 5-27. Such responses are insufficient to controvert the alleged fact and do not comply with Rule 56(c), Fed. R. Civ. P., or D. Kan. Rule 56.1(b) and (e). See Mondaine v. Am. Drug Stores, Inc., 408 F. Supp.2d 1169, 1176 (D. Kan. 2006).

The Court has no desire to make "technical minefields" of summary judgment proceedings, but neither can it countenance laxness in the proper and timely presentation of proof. Orsi v. Kirkwood, 999 F.2d 86, 92 (4th Cir. 1993). Despite the deficiencies in plaintiffs' responses to defendants' factual statements, where the information was readily available in the summary judgment record of nearly 2000 pages, the Court has gone beyond plaintiffs' citations to the record in an attempt to properly set forth the facts in a light most favorable to plaintiffs and to determine whether genuine issues of material fact preclude the entry of summary judgment for defendants.[5]

The following material facts are uncontroverted, deemed admitted or, where controverted, viewed in the light most favorable to plaintiffs, the non-movants.[6]

_____

[5]    Even if a non-movant does not respond at all, the Court must determine whether the movant is entitled to summary judgment on the merits. See Fed. R. Civ. P. 56(e)(3).

[6]    Plaintiffs have submitted an affidavit of Jay Uhls, who was an inmate at the Sedgwick County Jail. See Affidavit Of Jay Uhls (Doc. #283-21). Uhls' affidavit is deficient under Rule 56 of the Federal Rules of Civil Procedure. First, the sworn portion of Uhls' affidavit states that "I wrote a letter to Terry Bruner's Attorney detailing how he died without medical attention." Id. at 1. In his affidavit, Uhls sets forth excerpts of the letter, but he only affirms that he sent the letter to Terry Bruner's attorney, not that the information in the letter is true and correct. Id. Absent an affirmation of the truth of the contents of the letter, the statements in the attached letter, repeated in the affidavit, are unsworn and not competent evidence under Rule 56, Fed. R. Civ. P. See Doonan v. Case Power & Equip., No. 94-C-50076, 1995 WL 577641, at *3 (N.D. Ill. Sept. 14, 1995) (striking unsworn physician letters attached to plaintiff's affidavit); Brueggemeyer v. Am. Broad. Cos., Inc., 684 F. Supp. 452, 464 n.13 (N.D. Tex. 1988) (unsworn document with conclusions that generally track opinions set forth in affidavit insufficient).

Second, Uhls states that the information in his affidavit is "true in substance and in fact to my best information and belief." Doc. #283-21 at 2. Affidavits supporting or opposing summary judgment must be made on personal knowledge. See Fed. R. Civ. P. 56(c)(4); D. Kan. Rule 56.1(d). In this regard, affidavit testimony prefaced by phrases such as "to the best of my knowledge" and "on information and belief" is not sufficient. See Network Computing Servs. Corp. v. Cisco Sys.,

(continued...)

Robert Hinshaw is the current Sheriff of Sedgwick County and has held that position since December of 2008. During Bruner's incarceration from November of 2007 to March of 2008, Gary Steed was Sheriff of Sedgwick County and Hinshaw was the Undersheriff. During that same period, ConMed Healthcare Management, Inc. ("ConMed") contracted to operate the medical and mental health clinic at the Sedgwick County Adult Detention Facility ("Sedgwick Jail") in Wichita, Kansas.[7] ConMed agreed to provide or pay for medical services for Sedgwick inmates whether they were housed at the Sedgwick Jail or at other correctional facilities throughout Kansas.

On November 5, 2007, Bruner was incarcerated in the Sedgwick Jail.[8]  On November 6, 2007, during a medical screening with a ConMed employee, Bruner signed an Inmate Medical Screening Report which stated that he fully understood what he must do to receive medical treatment

---

[6](...continued)
Inc., 152 Fed. Appx. 317, 321 (4th Cir. 2005) (letter from attorney recounting witness's unsworn statement, on which witness confirmed with notarized signature that statements conveyed in letter were accurate representation of advice failed to satisfy statutory requirement that witness certify truth of unsworn statement by stating that it is "under penalty of perjury" or using other language substantially similar in form); Told v. Tig Premier Ins. Co., 149 Fed. Appx. 722, 725–26 (10th Cir. 2005) (declaration that facts are true to best of affiant's knowledge, information and belief not sufficient under Rule 56); cf. 28 U.S.C. § 1746 (valid declaration under penalty of perjury must be in substantially following form: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).").

Because of these global deficiencies, the Uhls affidavit is not competent evidence to withstand a motion for summary judgment.  Throughout this order, the Court notes further deficiencies in the Uhls' affidavit.

[7]     ConMed, Inc. owns ConMed Healthcare Management, Inc.  For purposes of summary judgment, the parties do not distinguish the legal claims brought against the two entities. Throughout this order, the Court refers to the two entities collectively as ConMed.

[8]     Earlier in the fall of 2007, Bruner was incarcerated at the Hutchinson Correctional Facility where medical records show that he had a history of hepatitis B, tuberculosis, liver cirrhosis, chronic back pain, nose bleeds, allergies, and he was diagnosed with Dysthymic Disorder, Delusional Disorder and alcohol dependence.

at the Sedgwick Jail.[9]  Bruner also signed a medical intake form which stated in part as follows:

> Emergency Care: Notify booking deputy immediately of emergency medical needs.
>
> Non-Emergencies – Sick Call Procedure: Upon transfer to general population, inmate may sign up with the POD deputy to be seen during normal sick call hours Monday through Friday.  Inmates can sign up for Sick Call at breakfast time Monday through Friday.  [Sedgwick Jail] inmates can also push an intercom button in their cells to communicate with the POD deputy to request medical care.

On November 8, 2007, Bruner transferred to the Stanton County jail in Johnson, Kansas, some 260 miles from the Sedgwick Jail.  Despite the transfer, because Bruner still was technically a Sedgwick County inmate, ConMed remained responsible for his medical care.

On March 4, 2008, after a report from another inmate that Bruner was ill, two Stanton County jailers, Jared Nichols and Carol Sheppard, checked on Bruner, who was in bed.  Bruner appeared ill and stated that he did not feel well.  The next morning, an inmate again reported that Bruner was sick, that he had bloody stools and that he was not eating.[10]  When Nichols and Sheppard went to check on Bruner and bring him breakfast, he told them that he did not want to eat and that he was sick and had the flu.  Bruner looked uncomfortable and appeared to have the flu.  Nichols and Sheppard concluded that Bruner needed immediate medical attention.  Nichols thought Bruner looked like he had the flu, but did not look like he was in pain, and did not seem to be that sick.  Nichols asked Bruner if he had bloody stools, and how long he had not been eating, but Bruner would not answer him.  Nichols asked Bruner if he was sick enough to see a doctor, and Bruner said "no."  Bruner did not appear to be confused, but did seem irritated.  Bruner told Nichols in no

---

[9]     The report also noted that Bruner had an "altered health condition" and was suffering from cirrhosis of the liver, as well as Hepatitis C.

[10]     Brian Freshour, an inmate at the Stanton County jail, said that Bruner was obviously ill because he remained in either a fetal position in his bunk or sitting on the toilet.  Bruner suffered from a constant, distinct hacking cough, as if he was coughing up vomit, and he constantly laid in bed and moaned.  Other than crackers and water, Bruner could not eat or drink anything.  Bruner also could not stand in line for linens, toiletries, or medical attention.

uncertain terms that he did not want to go back to Sedgwick County. Nichols and Sheppard decided to call the medical clinic at the Sedgwick Jail to report Bruner's condition and to arrange to have Bruner transported back to the Sedgwick Jail.

At about 8:00 a.m. on March 5, Sheppard called Ted Gibson, a corporal at the Sedgwick Jail who was assigned to population control that day, and reported that Bruner appeared to be sick and in need of immediate medical attention.[11]  Sheppard stated that Bruner had not been eating and reportedly had blood in his urine or stools.  Sheppard told Gibson that other inmates said Bruner was ill, but Bruner had said nothing because he did not want to return to the Sedgwick Jail.  Gibson told Sheppard to call ConMed and ask whether Bruner could be put on the next transport back to the Sedgwick Jail.[12]

Immediately thereafter, at approximately 8:15 a.m., Sheppard called ConMed and talked with a nurse, Joyce Beyrle.  Sheppard told Beyrle that he had a Sedgwick inmate who was weak, not eating meals for two days and had blood in his stools.  Beyrle recorded notes of her conversation with Sheppard in Bruner's medical chart.  Sheppard did not tell Beyrle that Bruner needed immediate medical attention.  Likewise, Sheppard did not tell Beyrle that it was urgent, emergent or routine. Beyrle did not review Bruner's medical chart or attempt to look up his medical history.[13] She presented Bruner's information to William Wondra, a physician assistant, who told her to have

---

[11]     Lieutenant Willetta Moore, who later conducted an internal investigation, admitted that according to Sheppard, he advised Gibson that Bruner needed immediate medical attention. Moore found this significant because he believed that if an out-of-county inmate needed immediate medication attention, the out-of-county jail would send him to a nearby or hospital.

[12]     Gibson thought that if Bruner's condition was an obvious emergency, Sheppard would not have suggested that Bruner return to the Sedgwick Jail and instead would have had Bruner examined and treated at a local medical facility in Stanton County.

[13]     ConMed nursing staff triage any calls from out-of-county jailers who call the clinic about a Sedgwick inmate with a medical issue.  Nursing staff have the inmate's medical chart available during the call.

Bruner brought back to the Sedgwick Jail to see a clinician the next day.[14]  He did not recommend that Bruner be sent to a local hospital in Stanton County because his condition was not presented as an emergent situation.[15]  See Beyrle Depo. at 49.  In presenting information to the physician assistant, Beyrle normally gives him the inmate's medical chart in emergency situations only.  Beyrle told Wondra that Bruner would be scheduled to see Fletcher the following day.[16]  Beyrle advised Sheppard that they would get Bruner transported back to Sedgwick ASAP.

A few minutes later, Beyrle called Gibson and told him that Bruner needed to be transported back to the Sedgwick Jail.  Gibson asked Beyrle if Bruner could be brought back the following day in the transport van.  Beyrle said yes.  Beyrle did not tell Gibson about ConMed's plan of action, when ConMed wanted to see Bruner or whether ConMed wanted to see Bruner at all.  Although Gibson did not discuss exactly when Bruner would be transported back to the Sedgwick Jail, Beyrle

---

[14]    Beyrle testified that she presented Bruner's information to the physician assistant and that she thought that Fletcher was the physician assistant on duty that day.  See Beyrle Depo. at 45 ("Charlie Fletcher [worked on March 5], and I hope I'm giving that right based on – I mean, I remember – it's really hard to remember, but I do believe it was Charlie Fletcher.").  Plaintiffs do not dispute that Wondra was actually on duty that day.  See Plaintiffs' Response To ConMed Statement Of Facts (Doc. #283) ¶ 9 (denying facts "in the manner and form alleged," with no specific denial that Wondra worked on March 5); see also Fletcher Depo. at 54-55 (Wondra, not Fletcher, worked on March 5); Time Card For William Fletcher (Doc. #272-22) (indicating that Fletcher did not work on March 5).

[15]    Beyrle was not aware of a policy or procedure that would have prevented Stanton County from taking an inmate such as Bruner to an emergency room.  Kendra (Maechtlen) Wolff, the ConMed Health Services Administrator, testified that for a medical emergency, Stanton County would send the inmate to an emergency room.  Wolff Depo. at 49.  For other medical issues, Stanton County would call ConMed and ask whether the medical issue should be addressed in Stanton County or Sedgwick County.  See id. at 50.  The clinician on call -- typically a mid-level nurse practitioner or physician assistant and in consultation if necessary with the doctor on call -- would determine whether the out-of-county inmate would go to a local emergency room or back to Sedgwick County.

[16]    When ConMed nursing staff received a call that another facility was transferring an inmate back to the Sedgwick Jail for a medical evaluation, the individual who took the call would schedule the inmate on the doctor sick call schedule or the physician assistant sick call schedule.  A nurse normally would first see such inmates.

expected that Bruner would arrive the next day, March 6.  As the population deputy, Gibson decided when an inmate would be transported back to the Sedgwick Jail.

Beyrle documented in Bruner's chart that he was to be scheduled to be seen by a clinician and a nurse on Thursday, March 6, which meant Bruner should have appeared on the clinician's schedule as well as the nurse's schedule for that day.  At approximately 8:42 a.m. on March 5, Amy Rodman-Riggs, a ConMed employee, scheduled Bruner for a medical appointment with a physician assistant on March 6 at 9:10 a.m.[17]  ConMed did not schedule appointments after 5:00 p.m.  The transport van rarely arrived back at Sedgwick (from Stanton County and other jails) before 5:00 p.m.  Unless an inmate arrived at the Sedgwick Jail before 5:00 p.m., that inmate would not be seen by medical staff until at least the following business day.

Gibson arranged for Bruner to be transported back to the Sedgwick Jail the next day, March 6, on the regular transport van.[18]  When ConMed directs the transport officer to have an inmate returned to the Sedgwick Jail for medical care, no policy requires the transport officer to inform anyone at the Sedgwick Jail that the inmate is coming back for medical care or otherwise document that the inmate is returning for medical attention.  In addition, the transport and other officers do not follow up to determine whether the inmate has actually arrived back at the Sedgwick Jail or whether the inmate has actually received medical treatment.[19]  Once an inmate arrives for

---

[17]     Bruner was also put on the nurse's schedule for March 6.  The nurse's schedule begins at 10:00 a.m.  If an inmate is put on a nurse's schedule, the nurse calls the inmate to the clinic during the day, reviews the chart and follows the medical orders.

[18]     Gibson or his superiors could have arranged to have Bruner immediately transported back to the Sedgwick Jail by air ambulance or special transport on March 5.  On several past occasions, the transport deputy scheduled a rapid transport outside of the normal transport schedule.

[19]     The Sedgwick Jail left to ConMed the responsibility to ensure that inmates returning from out of county to Sedgwick for medical treatment actually received the medical treatment.  ConMed, however, had no policy or procedure to track inmates who returned to the Sedgwick Jail
(continued...)

medical care, the inmate checks back in through booking and is reassigned a housing location based on classification. Deputies do not conduct any additional medical screening or ask why the inmate is returning.

Nichols was not aware that Bruner ate anything on Wednesday, March 5. The next morning, March 6, Bruner appeared to still have the flu and looked uncomfortable. In the early morning on March 6, Nichols told Bruner that he was being transferred back to the Sedgwick Jail. Bruner said that he did not want to go back. Nichols and Sheppard thought Bruner looked about the same. At 11:56 a.m. on March 6, Sedgwick County Sheriff Deputies Elton Bowman and Dana Hoffman picked up Bruner at the Stanton County jail. Bruner was so weak that Stanton County jailers had to carry him to the transport van. Bruner arrived back at the Sedgwick Jail at 5:00 p.m. Deputies logged Bruner's name into the computer in the booking area at 5:43 p.m.

The Trip Sheet shows that Bruner was being returned for "medical." Bowman testified that he would put the Trip Sheet in a file box in the transportation office once he was back at the Sedgwick Jail. Of the 21 inmates who were transported to or from Sedgwick Jail that day, Bruner was the only one transported for a medical reason. Normally, when an inmate is transported to the Sedgwick Jail, some sort of medical contact or screening occurs as parting of the booking process. Despite the fact that the Trip Sheet indicated that Bruner was being returned for "medical," deputies conducted no type of medical screening. The Sedgwick Jail did not have a medical screening process for an inmate who returned for medical care from an out-of-county facility.

From 7:00 a.m. to 11:30 p.m. on March 6, 2008, Charles Fletcher was working as a physician

[19](...continued)
for medical reasons to ensure that they actually received medical treatment. ConMed essentially relied on each inmate to sign up for sick call or otherwise notify deputies of the need for medical attention. Lieutenant Moore maintains that even though Wondra directed that Bruner be returned for medical treatment, Sedgwick Jail procedures required that Bruner specifically ask for medical attention in order to receive it.

assistant in the clinic.  Fletcher did not know why Bruner was on the schedule to be seen that day, and he did not typically try to get information on inmates on his schedule before the scheduled appointment or try to figure out why an inmate scheduled for sick call did not show up.  Fletcher testified that typically the last time he would look at his schedule would be just before 5:00 p.m.  At about 8:06 p.m. on March 6, Cassie (Leu) Looka, a certified medication aide, changed Bruner's scheduled medical examination to a physician chart review on March 9 at 8:00 a.m.[20]  Looka did not talk to Fletcher about Bruner.  Bruner stayed in the booking area until he arrived at his assigned cell in POD 1 at approximately 4:15 a.m. on March 7.  Bruner did not have a cellmate.

POD 1 is a protective custody area for inmates who are not placed in general population.  At all times, the POD deputy or a relief deputy remains in a POD booth which has a closed door, glass windows and a private bathroom.  The booth is in the middle of the POD, which allows the deputy to see the various sections of the POD and the inmates in the day rooms, as well as inmates who are moving or standing by the window in their cell doors.  From the booth, a deputy cannot hear inmates coughing or vomiting in their cells.  Inmates can communicate with a deputy in the booth by intercoms when they are in their cells or through slots in the booth's glass when they are in the POD day rooms.

Deputies supervise inmates in POD 1 indirectly and generally allow them at their will to stay in their cells or remain outside of their cells for much of the day in common day rooms.  Inmates may eat food that they purchase through commissary in their cells.  Except when an inmate is

---

[20]     ConMed did not provide Looka training on how to recognize mental illness in inmates or how to deal with inmates who had brain injuries or infections.  Looka did not receive any training on inmate safety or mental health issues, ConMed's strategy to catch and treat medical conditions early before they require hospitalization or any policy with respect to inmate rights to basic health and behavioral health care services.  She was not aware if ConMed had a quality assurance program, if ConMed conducted any evaluations of the adequacy of its medical care or if ConMed had any meetings with Sedgwick Jail personnel on these issues.

entering or exiting the cell, deputies keep cell doors closed and locked.  The POD deputy generally unlocks cell doors remotely from the booth.

Several times during a shift, a POD deputy or relief deputy conducts physical checks or rounds of inmates.  During these rounds, the deputy looks in the window of each cell, observes each inmate, and verifies that the inmate is breathing.  The deputies determine whether the inmate is present and alive, not whether the inmate has signs of illness or sickness.

ConMed had normal sick call hours on weekdays only.  Each weekday, inmates could sign up for sick call after breakfast at the end of the third shift (appx. 6:30 a.m.) or they could tell the POD deputy directly of their medical need.  By intercom announcement, the POD deputy reminded inmates to sign up for sick call.  In addition to sick call hours, jail officers could ask the clinic at any time to see an inmate for a medical concern.  Inmates could also complete "Kite" forms, available in the POD, to make requests including requests for medical treatment.  By policy, jail personnel had to respond to Kites on the day which they were submitted.  From March 6 to March 10, Bruner did not sign up for sick call, complete a Kite or ask any employee of the Sedgwick Jail for medical treatment or help.

From information on the computer, POD deputies could determine if an inmate had a scheduled medical appointment as well as the date and time of the appointment.  If an inmate had a scheduled appointment, deputies were not authorized to send the inmate to the clinic before ConMed personnel called for the inmate.  Deputies could call ConMed to expedite an appointment or issue a Code 1.  If an inmate had a medical appointment and ConMed did not call for the inmate, no policy or procedure required the deputies to follow up on the missed appointment.

In 2008, the Sheriff policy required that inmates receive necessary medical care without

delay.[21]  Deputies were expected to use their common sense when responding to an inmate request or known need for medical attention.  If an inmate appeared ill or the deputy otherwise recognized the need for medical attention, but no emergency was apparent, the deputy would (1) advise the inmate to place his name on sick call, (2) contact a supervisor for instruction and/or (3) call ConMed.  In the event of an apparent emergency, the deputy could call a Code 1, an emergency radio code alerting ConMed to respond immediately.  Absent exceptional circumstances, deputies were not to provide medical care.  Instead, they relied on clinic staff to make decisions concerning medical care.  Deputies were subject to discipline if they (1) did not address an inmate request for medical attention, (2) did not allow an inmate to sign up for sick call or (3) failed to take appropriate action where the necessity of medical attention was apparent.  For privacy reasons and consistent with federal privacy law, deputies did not have access to inmate medical records.

POD deputies did not know that Bruner had returned to the Sedgwick Jail for a medical examination.  Lisa M. Perez, Lisa R. Price, Rachel M. Gaines, Timothy McMahon, Bobby L. Hines and Abdul Smith worked as the POD 1 deputies from 11:00 p.m. on March 6 to 7:00 a.m. on March 9.[22]  None of these deputies recalled Bruner.  If he had appeared ill or someone had reported

---

[21]     Sheriff's General Order 117.00, Paragraph I, provided, in part as follows:

Each inmate in the Sedgwick County Detention Facility will be provided medical care from the time of admission throughout their period of incarceration.  The operation of medical staff shall be under the direction of the contracted medical service and administered by the Administrative Lieutenant.  All operations shall be consistent with accepted medical policies and procedures within the correctional/detention setting.

[22]     Perez worked from 11:00 p.m. on March 6 to 7:00 a.m. on March 7 and from 11:00 p.m. on March 7 to 7:00 a.m. on March 8.  Price worked from 7:00 a.m. to 3:00 p.m. on March 7. Gaines worked from 3:00 p.m. to 11:00 p.m. on March 7.  McMahon worked from 7:00 a.m. to 3:00 p.m. on March 8.  Hines worked from 3:00 p.m. to 11:00 p.m. on March 8.  Smith worked from 11:00 p.m. on March 8 to 7:00 a.m. on March 9.

that he was ill, they would have noted that fact on the computerized daily activity log ("DAL").[23] Because they did not make any such notations in the DALs, all of these deputies concluded that Bruner did not appear ill during their shifts and that they received no report that Bruner was ill.

From 7:00 a.m. to 3:00 p.m. on March 9, Mark B. Cook was the POD 1 deputy.  At some point between 7:30 a.m. and 10:30 a.m., and shortly after Cook announced that inmates could take showers, Bruner rang the intercom in his cell and asked Cook to open the cell.  Cook unlocked the cell and Bruner came out in his long underwear and started walking toward the showers.  Cook thought this was strange because he had just announced that inmates needed to be in their jumpsuits to leave their cells.  Cook told Bruner to return to his cell and put his jumpsuit on. Bruner slowly returned to his cell and closed the door behind him.  Cook then spoke with inmate Calvin L. Williams who told Cook that Bruner just stared and looked around at people, and that he had not eaten or come out of his cell since he had moved into POD 1. Cook verified that Bruner had moved to POD 1 on March 7.

A few minutes later, Bruner rang the intercom again.  Bruner was standing at his cell door window and it appeared that he did not have his jumpsuit on.  Cook told him again to put his jumpsuit on.  Cook asked Bruner if he had been eating.  Bruner said that he had not been eating and that he had not been feeling well.  Cook logged this in his DAL at about 10:32 a.m.[24]

Cook did not offer to call the clinic for Bruner, did not ask him whether he wanted to see a doctor, and did not remind him that he had the right to seek medical attention.  Even though Bruner said he did not feel well, Cook did not pay special attention to him.  Bruner never asked Cook to see

---

[23]     If an inmate is not eating, the POD deputy is required to log that fact in the DAL and report it to either a supervisor or ConMed.

[24]     Cook testified that if he was told that an inmate had not eaten for days and had bloody stools, he would contact his supervisor. The deputies were not permitted to call the clinic until they first went through the chain of command and notified their supervisor.

a doctor or to go to the clinic.  Bruner was able to respond to Cook's directions, answer and make intercom calls, dress himself and discuss how he had been and was feeling.  Bruner did not appear ill to Cook.  Cook did not believe that Bruner needed medical care, had any kind of emergency medical condition or had a condition that would prevent him from telling Cook if he needed medical attention.  Cook thought that as a grown man, Bruner could sign up for sick call.  Cook admitted that after deputies pull the sign up sheet around 6:30 a.m. each day, an inmate must wait until the following morning to sign up for sick call.[25]

Bruner finally put on his jumpsuit and Cook unlocked his cell.  Bruner slowly went into the day room and just stared into space.  When Cook asked him if he was doing OK, he replied yes. Cook thought that another inmate was bullying Bruner for his food.  Before lunch, Cook unsuccessfully tried to contact his supervisor, Sergeant Faustino Martinez, by radio to discuss how to address this issue.  Cook did not note his attempt to contact Martinez in his DAL.  In his DAL, however, Cook noted that he spoke to Martinez at 9:33 a.m. about another inmate.  Cook does not recall why he did not speak to Martinez about Bruner at that time because he believes that he already knew by 7:30 a.m. that Bruner reportedly had not been eating.

Cook made sure that Bruner got a tray of food at lunch and confirmed that Bruner ate his lunch.[26]  Cook assumed that Bruner was fine because he saw Bruner watching TV and visiting with

---

[25]      Cook generally would not call his supervisor or the clinic for medical attention unless an inmate (1) specifically tells him that he is ill, (2) passes out in front of him or (3) has a seizure, asthma attack or other comparable medical issue in front of him.  If an inmate simply appears ill, Cook would not contact anyone for medical attention because he believes that if an inmate wants medical attention, he can sign up for sick call.  For example, if Cook observed an inmate vomiting and the inmate told him that he was not feeling well, Cook would ask the inmate if he had signed up for sick call.  He would not document it or report it to his supervisor.

[26]      Plaintiffs note that in his DAL, Cook documented that Bruner received a lunch tray on March 9, but did not indicate if Bruner actually ate his meal.  Even so, such evidence does not controvert Cook's declaration and deposition testimony that he confirmed that Bruner ate his lunch.

(continued...)

other inmates in the POD day room that afternoon. At approximately 1:52 p.m., medical personnel were in POD 1, but Cook did not alert them to Bruner. At the end of his shift at 3:00 p.m., Cook reported to Daniel Safarik, the POD deputy on duty for the next shift, his observations of Bruner. He told Safarik to "keep an eye on [Bruner], to watch him, to see if anything was going on." Martinez did not review Cook's DAL on March 9.[27]

From 3:00 p.m. to 11:00 p.m. on March 9, Safarik was the POD 1 deputy. Safarik testified that he did not recall Bruner and that if Bruner had appeared ill or someone had reported that he was ill, he would have noted that fact on the DAL. Safarik concluded that Bruner did not appear ill during his shift and that he received no report that Bruner was ill. In his DAL, Safarik did not refer to Cook's request to keep an eye on Bruner or record any observations of Bruner's behavior.

Physicians usually did rounds on weekdays only. No physician reviewed Bruner's chart on Sunday, March 9, as scheduled.

From 11:00 p.m. on March 9 to 7:00 a.m. on March 10, Lisa Williams was the POD 1 deputy. Williams testified that she did not recall Bruner and that if Bruner had appeared ill or someone had reported that he was ill, she would have noted that fact on the DAL. Williams concluded that Bruner did not appear ill during her shift and that she received no report that Bruner

---

[26](...continued)

See Declaration Of Mark Cook (Doc. #287-3) ¶ 12; Cook Depo. (Doc. #283-9) at 177.

[27]     Lieutenant Willetta Moore conducted an internal investigation to determine whether staff followed policies for transporting Bruner back to the Sedgwick Jail. Moore reviewed documents, conducted interviews with deputies and medical staff, and collected written statements. On April 16, 2008, Lieutenant Moore recommended that Cook receive a written reprimand and be placed on two years probation because (1) he did not provide details in his DAL about whether Bruner ate on March 9 or document that Cook attempted to contact Martinez about Bruner and (2) he did not report to his supervisor his observations and interaction with Bruner on the morning of March 9. Cook resigned before Sedgwick County took the recommended disciplinary action.

was ill.[28]  Williams was previously a licenced certified nurse's assistant ("CNA"), as well as a

former volunteer emergency medical technician ("EMT").  Williams was well aware that a person

who has not eaten for several days could be seriously ill.  She admitted that if Bruner was awake and

throwing up, she would have been able to observe that fact when she did her rounds.  Williams

performed two or three physical rounds during her shift.  Williams admitted that if an inmate

reported that he had not been eating for several days and that he was not feeling well, she would

either report it to her sergeant or tell the inmate to sign up for sick call.

Sergeants at the Sedgwick Jail generally supervised about eight deputies.  The sergeants

made rounds to the multiple PODs and were required to review DAL entries made by deputies on

their shifts.  Sergeants Wayne Brown, Rhonda Freeman, Gerald Pewewardy, Jared Schecter and

Robert Taylor were on duty from 7:00 a.m. on March 7 through 7:00 a.m. on March 10.[29]  The

sergeants did not know Bruner's medical history, did not have access to his medical records, and did

not know that he had been brought back from Stanton County or for what reason.  Sergeants Brown,

Freeman, Pewewardy, Schecter and Taylor do not recall personally observing Bruner.  They

conclude that they did not observe that Bruner was ill and that they received no report that he was

ill.

_____

[28]    At breakfast time that morning, inmate Jay Uhls saw Bruner lying on the floor unresponsive.  See Uhls Affidavit (Doc. #283-21) at 2.  Uhls reported to the deputy in the POD booth that Bruner had been sick and was lying on his cell floor.  See id.  Uhls states that "he (the officer) didn't do anything."  Id.  Because Williams is a female deputy, Uhls' affidavit does not controvert Williams' declaration that she received no inmate report that Bruner was ill.

[29]    Pewewardy worked from 7:00 a.m. to 3:00 p.m. on March 7 (supervising Price) and from 7:00 a.m. to 3:00 p.m. on March 8 (supervising POD Deputy McMahon).  Brown worked from 3:00 p.m. to 11:00 p.m. on March 7 (supervising POD Deputy Gaines).  Schecter worked from 11:00 p.m. on March 7 to 7:00 a.m. on March 8 (supervising POD Deputy Perez).  Freeman worked from 3:00 p.m. to 11:00 p.m. on March 8 (supervising POD Deputy Hines) and from 3:00 p.m. to 11:00 p.m. on March 9 (supervising POD Deputy Safarik).  Taylor worked from 11:00 p.m. on March 9 to 7:00 a.m. on March 10 (supervising POD Deputy Williams).

From 7:00 a.m. to 3:00 p.m. on March 10, Mary Staton was the POD 1 deputy.  Staton was also trained as a CNA and had worked previously as a nurse's aid.  She conducted a headcount at the beginning of her shift and looked into each inmate's cell.  She does not recall seeing or hearing anything unusual in Bruner's cell.  At approximately 7:15 a.m., Staton saw Bruner come out of his cell for linen exchange, but he did not have his linens.  Bruner appeared confused.  Staton sent him back into his cell to retrieve the linens.  She unlocked the cell door several times, but each time Bruner would open his cell door and then shut it without entering his cell.

Between 7:20 a.m. and 7:50 a.m., Staton asked Marque Jameson and Michael Murphy, who were roving deputies, to put Bruner back into his cell.  Jameson and Murphy helped Bruner walk to his cell.  Staton saw that Bruner went into his cell without incident.  Jameson and Murphy noticed, however, that even though Bruner complied with their orders, he appeared in a daze and was acting strange and moving extremely slowly.  Bruner did not appear to be in pain or distress.  Staton, Jameson and Murphy believed that Bruner had a mental health condition and did not need emergency care from a medical provider.  Staton did not suspect any physical health issue.  Jameson and Murphy understood that Staton, who was the deputy in charge of POD 1 at that time, would address the matter.  Bruner apparently stayed in his cell the rest of the morning and did not ask to get out.

At some point between 7:15 a.m. and 10:25 a.m., inmate Brad Snider told Staton that Bruner had not eaten since he arrived in POD 1.  Staton looked up when Bruner came to the POD and noted that he had returned to the Sedgwick Jail from out of county on March 6.  She continued to believe that Bruner's unusual actions and failure to eat were a result of a mental condition. She did not suspect that Bruner was physically ill or that he needed emergency care.  Staton did not log her interaction with Snider in her DAL.

At approximately 10:25 a.m. on March 10, Staton told Martinez, her supervisor, about

Bruner's behavior and that an inmate had reported that Bruner had not eaten for three days. Martinez instructed Staton to contact ConMed for a mental health check. Staton called Andrea Skelton, LMSW (Licensed Master Social Worker), a mental health worker at ConMed, who told Staton that she could see Bruner when they did rounds that afternoon.[30]  Staton believed that it was a mental health issue. Staton did not request that Bruner be seen immediately and she did not log these events in her DAL. Martinez told Staton to monitor whether Bruner ate his lunch.

At 11:50 a.m. on March 10, lunch was distributed to the inmates. Staton determined that Bruner did not eat his lunch. Staton entered this fact in her DAL and also entered it into Bruner's computer "inmate log" as a warning. She did not believe that Bruner needed emergency care, but thought that his apparent refusal to eat should be addressed. Staton contacted Martinez and reported that Bruner had not eaten his lunch. Staton also reported that Bruner did not come out his cell for lunch and appeared depressed and antisocial. Martinez notified Lisa Armstrong, R.N., a ConMed mental health nurse, and requested a "courtesy check" on Bruner when she did her rounds.[31]  Inmate Bamideld Ogunbiyi also reported to Staton that Bruner had not eaten for days. At this point, Staton did not know if Bruner's symptoms were the result of a mental or medical problem.

Staton intended to "keep an eye" on Bruner until mental health performed its afternoon rounds, but she did not make any effort to check on Bruner until several inmates advised Staton at 2:00 p.m. that Bruner was lying on the floor of his cell and not moving.[32]  Staton called Jameson to

---

[30]     Skelton normally did rounds between 2:30 and 3:00 p.m.

[31]     When ConMed hired Armstrong in approximately 2006, she received training on how to identify a medical emergency, but this training was mainly redundant as she had been a registered nurse since 1995. ConMed primarily trained Armstrong on how to fill out paperwork and to ensure that she followed policies. Armstrong read the various nursing protocols particularly those involving mental health, but ConMed did not confirm that she had done so.

[32]     Shortly after lunch was served on March 10, inmate Jay Uhls reported to a female
(continued...)

check on Bruner.  At 2:11 p.m., Jameson found Bruner in his cell, lying on the floor in a pile of trash, curled up in the fetal position. Where he was located in the cell, no one outside the cell could see him unless he or she was standing at the cell door.  Bruner appeared to be in a daze.  Again, he did not appear to be in pain or distress.  He was trying or struggling to get up. Jameson picked him up and placed him in his bunk.  Staton could not see Bruner from the booth, but Jameson told her that Bruner was "not doing good" and that something was wrong with him.  Jameson did not tell Staton that Bruner needed emergency care.  Jameson understood that Staton was addressing the matter. Jameson left the POD at 2:20 p.m.  Staton continued to think that Bruner had a mental health issue and did not need emergency care.[33]  Staton contacted Martinez and told him that mental health personnel had not yet arrived in the POD.  Martinez told Staton that he would again contact ConMed mental health personnel.  At approximately 2:45 p.m., Martinez contacted Skelton.  Martinez told Skelton of Bruner's behavior and asked to have someone check on him.

On weekdays, a mental health evaluator and a registered nurse conducted daily rounds.  At approximately 3:00 p.m. on March 10, during their daily mental health rounds, Armstrong and Skelton arrived at Bruner's cell.  They thought that Bruner appeared to be "very sick" and in need of medical attention.  Armstrong did a quick mental health assessment and a quick physical

---

[32](...continued)
deputy that Bruner has "been sick and hasn't eaten in days."  See Uhls Affidavit (Doc. #283-21) at 2. The female deputy replied that Bruner was "faking it."  Id.  Uhls states that he does not know the name of the female deputy, but that he knows what she looks like.  See id.  Such evidence is insufficient to establish that Staton received the report from Uhls.  Plaintiffs do not even ask the Court to draw this conclusion, but rather vaguely state that Uhls reported the information to "the deputy."  Doc. #283 at 53; see also id. at 81-84 (no reference to Uhls report in discussion of evidence relating to Staton).

[33]     The Sedgwick Jail does not have a policy or procedure to monitor obvious signs and symptoms of illness which may need medical attention.  Other than a CPR class, Sedgwick County does not provide deputies any medical training and does not provide instruction on what constitutes a medical emergency.

assessment on Bruner and knew something was not right.  Bruner was very sweaty, lethargic, weak, warm to the touch, not oriented and unresponsive to cues: he simply grunted and moaned.  Bruner was sitting on his bunk with his knees up and he was hunched over.  Armstrong had to physically pick up his head to check his pupils.  Staton reported to Skelton that Bruner had been unresponsive for a few hours.  See Skelton Depo. at 22-24 (deputy in booth reported that Bruner had been unresponsive for a few hours and that they were not sure if he was having symptoms of a mental or medical problem).  Armstrong and Skelton thought that it was obvious that the physician assistant needed to evaluate Bruner immediately.  Armstrong went to the POD booth, called the clinic and requested that someone bring a wheelchair immediately to pick up Bruner so the physician assistant could evaluate him.  Deputies brought a wheelchair, put Bruner into the chair and wheeled him out of the POD at 3:26 p.m.

When Bruner arrived at the clinic, Lisa Tolan, LPN, evaluated him.  She took his vitals and noted that he was unalert, unresponsive to painful stimuli and unable to ambulate.  She noted his history of Hepatitis C, cirrhosis of the liver and possible tuberculosis.  She further noted moderate skin jaundice, warm skin, turgor and slow capillary refills.  She notified Fletcher who gave verbal orders to set up an IV, draw labs and test Bruner's stool for blood.  Labs were drawn at 4:10 p.m.

At 5:20 p.m., Sharon Nelson, RN, saw Bruner and noted his condition.  At 5:30 p.m., Fletcher saw Bruner, conducted a rectal exam and noted his condition.  Minutes later, Fletcher ordered IV fluids. Fletcher testified that he suspected Bruner was experiencing liver failure, and that fluids would help him.  Between 6:00 p.m. and 6:50 p.m., Nelson saw Bruner two additional times and noted her observations and actions.

At approximately 9:01 p.m., Fletcher reviewed the lab results and noted that Bruner's white blood cell count was high.  Fletcher ordered IV antibiotics and to transfer Bruner to a local hospital.  At 9:39 p.m., EMS personnel transported Bruner to the hospital.

Two days later, on March 12, 2008, Bruner died in the hospital.[34]  Plaintiffs' forensic pathology expert, Dr. Werner Spitz, opined that as a result of untreated sclerosis of the liver, Bruner suffered a prolonged process of dying, which included brain swelling.  Bruner's brain swelling manifested through physical symptoms such as difficulty walking, confusion and inability to eat.  These symptoms began on March 5 and progressed until he died on March 12.  As a result of liver sclerosis, toxic substances accumulated in Bruner's liver and blood which significantly suppressed his immune system.  As his brain swelled, the brain stem was compressed and pushed onto the respiratory center, causing difficulty breathing.  As a result of his impaired breathing, Bruner developed meningitis.[35]  Bacterial meningitis is a treatable condition that often responds to IV antibiotic therapy.  When medical personnel gave Bruner antibiotics at approximately 9:20 p.m. on March 10, it was too late to prevent his death.  If medical personnel had provided IV antibiotics about six hours earlier, Bruner probably would have survived.

Plaintiffs' infectious disease expert, Dr. Steven Hosea, opined that Bruner was "salvageable" until shortly after mental health personnel evaluated him at approximately 3:00 p.m. on March 10.  Dr. Hosea opined that Bruner had exhibited symptoms of pneumococcal meningitis for some period before his death.  Dr. Hosea testified, however, that the first signs of meningitis can be quite general

---

[34]     The cause of death was brainstem herniation, secondary to cerebral edema, resulting from suppurative meningitis.  An autopsy revealed that Bruner had marked ascites (accumulation of fluid in the abdominal cavity), esophageal varices (swelling and distention of the esophageal veins due to a back-up of large amounts of blood), sclerosis of the liver, jaundice, brain swelling and brain stem herniation.  Bruner had a significant infection in his body.  A blood analysis revealed that his white blood count was 34.6.  A normal value is between 5 and 10.  This extremely high white blood count indicates that Bruner was suffering from sepsis.

[35]     The meningitis caused an infection in the lungs that eventually percolated to the brain.  As the meningitis progressed, his brain swelling intensified.  Bruner's brain swelling ultimately led to herniation of the brain stem, which was fatal.  As a brain swells from a toxic trauma, as in Bruner's situation, the relatively soft brain tissue becomes voluminous and hits the rigid skull bone.  As the swelling increases beyond the space of the skull, it extends downward into the brain stem, which is the regulatory center for the heart and respiratory functions.

and may consist of headache, high fever, fatigue and irritability or signs of a common cold or flu. Pneumococcal meningitis can be fatal even if treated. According to Dr. Hosea, even if Bruner had received treatment in a more timely manner, he had a significant risk of a poor outcome.

Kendra (Maechtlen) Wolff, the ConMed Health Services Administrator, did not learn about the events concerning Bruner until after he was in the hospital. Alicia Mefford, the ConMed Director of Nursing, worked on March 6 and March 10, 2008, but she did not render any medical care to Bruner. No one told Mefford about Bruner's condition on March 10.

### Analysis

The Sedgwick County Defendants argue that Bruner's children cannot assert a Section 1983 claim on their own behalf for denial of their father's constitutional rights.[36] A civil rights action "must be based on the violation of plaintiff's personal rights, and not the rights of someone else." Archuleta v. McShan, 897 F.2d 495, 497 (10th Cir. 1990). The proper federal remedy in a Section 1983 case is a survival action brought by the estate of the victim. Berry v. Muskogee, 900 F.2d 1489, 1506-07 (10th Cir. 1990); Payne v. McKune, No. 06-3010-JWL, 2007 WL 60941, at *3 (D. Kan. Apr. 4, 2007). Because plaintiffs have not alleged or shown that defendants' alleged conduct was directed at them, the Court sustains defendants' motions for summary judgment as to the claims by Bruner's children. See Kelly v. Rockefeller, 69 Fed. Appx. 414, 416 (10th Cir. 2003) (plaintiff lacked standing to bring mother's civil rights claims); Teufel v. United States, 5 F.3d 547 (Table), 1993 WL 345530, at *2 (10th Cir. Aug. 26, 1993) (independent, nonderivative constitutional claim from injury to family can only arise if impermissible conduct directed at plaintiff's protected relationship with victim); Trujillo v. Bd. of Cnty. Comm'rs, 768 F.2d 1186 (10th Cir. 1985) (rejecting wrongful death claim by mother and daughter of victim where no

---

[36]     Defendants do not dispute that Tera Bruner-McMahon may assert a Section 1983 claim in her capacity as administrator of her father's estate.

showing that jailers directed activity toward familial relationship with intent to interfere with that relationship); Williams v. U.S. Dept. of Justice, No. 08-2631-KHV, 2009 WL 1313253, at *2 n.6 (D. Kan. May 12, 2009) (plaintiff lacked standing to assert civil rights action on behalf of sons). But cf. Lowery v. Cnty. of Riley, No. 04-3101-JTM, 2005 WL 1242376, *10 (D. Kan. May 25, 2005) (claim for loss of familial association asserted by daughter of victim sufficient to withstand motion to dismiss).

Under Section 1983, a defendant sued in an individual capacity may be subject to personal liability and/or supervisory liability.[37]  Personal liability "under § 1983 must be based on personal involvement in the alleged constitutional violation." Brown v. Montoya, 662 F.3d 1152, 1163 (10th Cir. 2011); Foote v. Spiegel, 118 F.3d 1416, 1423 (10th Cir. 1997).  On the other hand, supervisory liability allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, or implements a policy which subjects, or causes to be subjected that plaintiff to the deprivation of any rights secured by the Constitution. Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010), cert. denied, 131 S. Ct. 2150 (2011).

## I.      Personal Liability Claims Against Employees Of Sedgwick Jail

Prison officials violate the Eighth Amendment when they are deliberately indifferent to an inmate's serious medical needs.  See Estelle v. Gamble, 429 U.S. 97, 104 (1976); Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980), cert. denied, 450 U.S. 1041 (1981).  Deliberate indifference may

---

[37]      Section 1983 provides in part as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983

be proven by showing that prison officials intentionally denied, delayed access to or interfered with an inmate's necessary medical care.  See Estelle, 429 U.S. at 104-05; Jones v. Hannigan, 959 F. Supp. 1400, 1406 (D. Kan. 1997); see also Farmer v. Brennan, 511 U.S. 825, 835-37 (1994) (prison officials act with deliberate indifference to inmate's health if they know that he faces substantial risk of serious harm, and disregard that risk by failing to take reasonable measures to abate it).

The test for deliberate indifference includes both an objective and a subjective component. Sealock v. Colorado, 218 F.3d 1205, 1209 (10th Cir. 2000).  The objective component of the deliberate indifference standard requires a sufficiently serious deprivation that results in the denial of the "minimal civilized measure of life's necessities."  Farmer, 511 U.S. at 834 (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)).  Defendants concede that in light of Bruner's death, plaintiffs can satisfy the objective component.  Defendants maintain, however, that they are entitled to summary judgment on the subjective component of plaintiffs' deliberate indifference claims.

To satisfy the subjective component, plaintiffs must present evidence that each defendant knew of and disregarded an excessive risk to inmate health or safety.  Farmer, 511 U.S. at 837; Callahan v. Poppell, 471 F.3d 1155, 1159 (10th Cir. 2006); Riddle v. Mondragon, 83 F.3d 1197, 1202 (10th Cir. 1996).  This standard is not satisfied by proof of negligence or constructive notice of medical need. See Farmer, 511 U.S. at 835, 841.  Under the subjective component, the relevant question is "were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?"  Mata v. Saiz, 427 F.3d 745, 753 (10th Cir. 2005).  The prison official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference.  Farmer, 511 U.S. at 837.  Plaintiffs must show that a prison official disregarded the specific risk of harm actually claimed.  Martinez v. Beggs, 563 F.3d 1082, 1089 (10th Cir. 2009); see Estate of Hocker v. Walsh, 22 F.3d 995, 1000 (10th Cir. 1995) (plaintiffs required to show deliberate indifference to specific risk of suicide, not

merely general risk of intoxication).

A reasonable jury may conclude that a prison official subjectively knew of the substantial risk of harm by circumstantial evidence or "from the very fact that the risk was obvious." Martinez, 563 F.3d at 1089 (quoting Farmer, 511 U.S. at 842). An obvious risk, however, cannot conclusively show that the prison official subjectively knew of the substantial risk of harm because "a prison official may show that the obvious escaped him." Martinez, 563 F.3d at 1089 (quoting Farmer, 511 U.S. at 843 n.8); Estate of Carter v. City of Detroit, 408 F.3d 305, 313 (6th Cir. 2005) (genuine issue of material fact as to deliberate indifference can be based on strong showing of objective component). In addition, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 844. On the other hand, a prison official does not escape liability if the evidence shows that "he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." Id. at 843 n.8.

Under these standards, even a brief delay in providing medical care may constitute a violation of the Eighth Amendment where prison personnel delay care in a life-threatening situation or where it is apparent that delay would exacerbate the prisoner's medical problems. Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir. 1999); see Mata, 427 F.3d at 755; see also Rutherford v. Med. Dep't of Dep't of Corr., 76 Fed. Appx. 893, 902 (10th Cir. 2003) (inmate stated claim for deliberate indifference where medical staff disregarded complaints about severe pain, prescribed exercise and physical therapy that worsened condition without first performing tests or examination, delayed referring him to doctor, allowed orders for referrals to expire, and failed to schedule prescribed tests, surgery and follow-up care); Sealock, 218 F.3d at 1210 (delay of several hours in taking inmate with chest pains to hospital violated Eighth Amendment); Boretti v.

Wiscomb, 930 F.2d 1150, 1154-55 (6th Cir. 1991) (prisoner who suffers pain needlessly when relief is readily available may state claim for deliberate indifference); Brown v. Hughes, 894 F.2d 1533, 1538 (11th Cir.) (few hours delay in treating inmate's broken foot could render defendants liable), cert. denied, 496 U.S. 928 (1990); Lewis v. Wallenstein, 769 F.2d 1173, 1183 (7th Cir. 1985) (15-minute delay in treating cardiac arrest may violate Eighth Amendment).

All of the individual defendants argue that plaintiffs have not presented sufficient evidence for a reasonable jury to conclude that they knew that Bruner had a risk of a fatal medical condition and chose to disregard it. As to all of the individuals associated with the Sedgwick Jail, plaintiffs argue that "since at least March 5, 2008, Bruner's deteriorating physical condition was obvious to his fellow inmates and, likewise, would have been obvious to any of the deputies who were working on POD 1 from March 7, 2008 through March 10, 2008." Doc. #283 at 11-16. Plaintiffs have presented evidence that Bruner's condition was obvious to Stanton County jailers, but they have not presented similar competent evidence with respect to Sedgwick Jail personnel.[38] Sedgwick Jail inmate Uhls states that at some point, he told the officers that Bruner was not eating and that he was coughing and throwing up. Uhls Affidavit (Doc. #283-21) at 1. Uhls states that later he and other inmates raised these same issues with two or three officers with no response. Id. Uhls does not identify or specify when he and other inmates made these reports. Moreover, Uhls does not state that Bruner's condition was obvious to any of the specific defendants named in this action.

From March 6 through 10, 2008, numerous individuals associated with the Sedgwick Jail had contact with Bruner or supervisory responsibility over officers who had contact with him.

---

[38] Stanton County inmate Freshour states that "it was clearly obvious to everyone in the dormitory, as well as Stanton County Jailers, that Terry Bruner was extremely ill, because Terry Bruner would cough and lie[sic] in his bed and moan" and that he "suffered from a distinct hacking cough [that] sounded like he was always coughing up vomit." Freshour Affidavit ¶¶ 8, 10. The fact that Freshour believed that Bruner's condition was obvious to Stanton County jailers is insufficient to show that his condition was obvious to every deputy at the Sedgwick Jail.

Unfortunately, no one at the Sedgwick Jail summoned medical attention until 3:00 p.m. on March 10. As to most of the individual defendants, plaintiffs have not offered sufficient evidence to show that defendants knew of and disregarded an excessive risk to Bruner's health. Bruner himself apparently did not recognize the seriousness of his medical condition. On March 5, 2008, Bruner told a Stanton County jailer that he had the flu, but that he was not sick enough to see a doctor. On March 9, 2008, when Cook asked Bruner if he was okay, he replied yes. In addition, from March 5 to 10, 2008, Bruner did not sign up for sick call, complete a Kite or ask any employee of the Sedgwick Jail for any type of assistance or medical care.[39]

The Court addresses the personal liability claims against the Sedgwick County Defendants in turn.

### A.    Ted Gibson

Plaintiffs argue that Gibson, who was assigned to population control at the Sedgwick Jail on March 5, should have arranged to have Bruner transported immediately back to the Sedgwick Jail. Based on Sheppard's initial report of Bruner's condition, Gibson told Sheppard to call ConMed and ask whether Bruner could be put on the next transport back to the Sedgwick Jail. Although Gibson was responsible to determine when an inmate would be transported back to the Sedgwick Jail, he specifically asked Beyrle on March 5 if Bruner could be brought back the following day in the transport van. Beyrle said yes. Beyrle did not tell Gibson about ConMed's plan of action, when ConMed wanted to see Bruner or whether ConMed wanted to see Bruner at all. Gibson thought that

---

[39]    An inmate's failure to personally notify prison officials of an alleged risk to his safety is not dispositive as to whether prison officials knew of the risk. <u>Farmer</u>, 511 U.S. at 848-49. Even so, an inmate's failure to ask for medical care, when he was able to do so, is persuasive evidence that the risk to the inmate's health was not obvious. Viewing the evidence in the light most favorable to plaintiffs, at some point on March 10, Bruner was no longer able to ask for medical care. Plaintiffs have presented no evidence, however, that before the morning of March 10, Bruner could not do so.

if Bruner's condition was an obvious emergency, Sheppard would not have suggested that Bruner return to the Sedgwick Jail and would have instead had a local medical facility in Stanton County examine and treat Bruner. Plaintiffs present no evidence that Gibson had any idea that by scheduling Bruner to be transported on March 6 rather than March 5, he was exposing Bruner to a substantial risk of serious harm. The Court therefore sustains defendants' motion for summary judgment as to Gibson.[40]

### B.    POD Deputies Perez, Price, Gaines, McMahon, Hines And Smith

Perez, Price, Gaines, McMahon, Hines and Smith worked as the POD 1 deputies from 11:00 p.m. on March 6 to 7:00 a.m. on March 9.[41] All of these deputies testified that they did not recall Bruner and that if he had appeared ill or if someone had reported that he was ill, they would have noted that fact on the computer DAL. Because they did not make any such notations, all of these deputies concluded that Bruner did not appear ill during their shifts and that they received no report that he was ill.

Plaintiffs argue that Perez, Price, Gaines, McMahon, Hines and Smith "should have observed the same signs of a serious medical condition as the inmates and the Stanton deputies did," Plaintiffs' Memorandum In Opposition (Doc. #283) at 24-28, but they present no specific evidence that they did so. Plaintiffs note that inmate Uhls observed that from Bruner's arrival until officers

---

[40]    Plaintiffs also argue that Gibson was deliberately indifferent because he made no effort to ensure that someone contacted the clinic when Bruner arrived at the Sedgwick Jail. Plaintiffs present no evidence that Gibson was working at that time or that he had any reason to believe that Bruner could not adequately inform Sedgwick Jail personnel of his situation. On the present record, at most, plaintiffs could show that Gibson was negligent, not that he was deliberately indifferent to an excessive risk to Bruner's health.

[41]    Perez worked from 11:00 p.m. on March 6 to 7:00 a.m. on March 7 and from 11:00 p.m. on March 7 to 7:00 a.m. on March 8. Price worked from 7:00 a.m. to 3:00 p.m. on March 7. Gaines worked from 3:00 p.m. to 11:00 p.m. on March 7. McMahon worked from 7:00 a.m. to 3:00 p.m. on March 8. Hines worked from 3:00 p.m. to 11:00 p.m. on March 8. Smith worked from 11:00 p.m. on March 8 to 7:00 a.m. on March 9.

took him to the clinic on March 10, Bruner was coughing and vomiting. No evidence suggests that Bruner was doing so, however, when these POD deputies observed him. Inside the booth, the POD deputy could not hear inmates coughing or vomiting in their cells.[42]

Beyrle, a ConMed nurse, testified that if Bruner was having medical problems, the deputies on duty would have known of this fact based either on their personal observations while performing rounds or possibly from Bruner or other inmate reports of his condition. Beyrle did not testify (1) that Bruner exhibited symptoms continuously, (2) how often deputies made rounds to check on inmates or (3) whether she examined the specifics of any inmate reports. Her belief that someone should have observed that Bruner had medical problems may be sufficient to prove negligence by someone, but it is insufficient to show that any particular deputy in fact observed such problems or received an inmate report that Bruner needed medical attention. Plaintiffs essentially argue that these deputies had constructive notice that Bruner was ill, but such notice does not establish deliberate indifference to serious medical needs. See Farmer, 511 U.S. at 838 (official's failure to alleviate significant risk that he should have perceived but did not, while no cause for commendation, cannot be condemned as infliction of punishment).

Plaintiffs have presented no evidence that any inmate reported that Bruner was ill during the shifts of Perez, Price, Gaines, McMahon, Hines and Smith. Uhls states that he and other inmates told at least two or three deputies that Bruner was not eating, and that he had been coughing and vomiting, but that deputies made no effort to obtain medical care for Bruner. Uhls does not specify the inmates who reported this information, the deputies who received the reports or the date and time of the reports. No POD deputy who worked from Bruner's arrival on March 5 through 7:00 a.m.

---

[42]     Plaintiffs note that the deputies failed to note in their DALs that Bruner did not eat or leave his cell or that he was coughing and vomiting, but they have presented no evidence that the deputies actually observed any such events.

on March 9 recalled any complaints. Absent speculation, a reasonable jury could not conclude that Perez, Price, Gaines, McMahon, Hines or Smith knew that Bruner faced a substantial risk of serious harm and chose to ignore it. The Court therefore sustains defendants' motion for summary judgment as to these six defendants.

### C.    POD Deputy Mark Cook

From 7:00 a.m. to 3:00 p.m. on March 9, Cook was the POD 1 deputy. During his shift, Cook observed Bruner acting strangely. After Cook received an inmate report that Bruner just stared and looked around at people, and that he had not eaten or come out of his cell since he moved into POD 1, Cook asked Bruner if he had been eating. Bruner said no and that he had not been feeling well. Cook logged this in his DAL at about 10:32 a.m. Later, when Cook observed Bruner moving slowly and just staring into space, Cook asked him if he was doing okay, and Bruner replied yes.

Plaintiffs note that despite Cook's observation of Bruner, and Bruner's own statements that he was not feeling well, Cook did not call the clinic, did not ask Bruner whether he wanted to see a doctor or remind him that he had the right to seek medical attention. In retrospect, Bruner's condition was extremely serious, but plaintiffs have not established a genuine issue of material fact that his observable symptoms and comments conveyed to Cook the seriousness of his medical condition. In light of Cook's observation and interaction with Bruner, he felt that another inmate was bullying Bruner for his food.[43] To address his concern, Cook personally gave Bruner a tray of food at lunch and confirmed that Bruner ate his food. That afternoon, Cook observed Burner

---

[43]    Before lunch, Cook unsuccessfully tried to contact his supervisor, Faustino Martinez, to discuss by radio how to address this issue. Cook did not note his attempt to contact Martinez in his DAL. In his DAL, however, Cook noted that he spoke to Martinez at 9:33 a.m. about another inmate. Cook does not recall why he did not speak to Martinez about Bruner at that time because he believes that he already knew by 7:30 a.m. that Bruner reportedly had not been eating.

watching TV and visiting with other inmates in the POD day room.[44]  At the end of his shift, Cook

reported to Safarik, the POD deputy on duty for the next shift, his observations of Bruner.  He told

Safarik to "keep an eye on [Bruner], to watch him, to see if anything was going on."  No reasonable

jury could find that Cook was deliberately indifferent to a risk of substantial harm to Bruner.

Plaintiffs note that Lieutenant Moore later recommended that Cook be reprimanded and

placed on probation for his failure to set forth details in his DAL about (1) whether Bruner actually

ate his lunch on March 9, (2) Cook's attempt to contact Martinez during the morning of March 9 and

(3) his interaction with Bruner during the morning of March 9.  The lack of detail in Cook's DAL,

however, is insufficient to create a genuine issue of material fact whether Cook knew of a serious

risk to Bruner's health and chose to disregard it.  In particular, Cook thought that Bruner was not

eating because he was being bullied.  Cook attempted to address this issue by personally giving

Bruner a tray of food and confirming that he ate his lunch.  Cook thought to the extent Bruner had

a medical issue, it was not an emergency and that Bruner was capable of signing up for the next sick

call.  Plaintiffs have not created a genuine issue of material fact that Cook knew of and disregarded

an excessive risk to Bruner's health.  The Court therefore sustains defendants' motion for summary

judgment as to Cook.

### D.    POD Deputy Daniel Safarik

From 3:00 p.m. to 11:00 p.m. on March 9, Safarik was the POD 1 deputy.  Plaintiffs note that

in his DAL, Safarik did not record (1) whether Bruner ate dinner that evening, (2) that Cook asked

Safarik to keep an eye on Bruner or (3) that Bruner was coughing and vomiting repeatedly.  See

Doc. #283 at 80.  As explained above, the POD deputy primarily works in a booth and cannot hear

---

[44]      In his DAL, Cook documented that Bruner received a lunch tray on March 9, but he
did not indicate whether Bruner actually ate his meal.  As explained above, this evidence is
insufficient to controvert Cook's testimony that he saw Bruner eat his meal.

inmates coughing or vomiting in their cells. Plaintiffs have presented no evidence that Safarik personally observed or received any report that Bruner was seriously ill. Indeed, Safarik testified that he did not recall Bruner and that if Bruner had appeared ill or someone had reported that he was ill, he would have noted that fact on the DAL. Safarik concluded that Bruner did not appear ill during his shift and that he received no report that Bruner was ill. Cook did ask Safarik to keep an eye on Bruner, but no evidence suggests that Safarik did not in fact do so. The fact that Safarik did not record Cook's statement or his own observations of Bruner is insufficient for a reasonable jury to conclude that Safarik knew of and disregarded an excessive risk to Bruner's health. See Farmer, 511 U.S. at 837. Accordingly, the Court sustains defendants' motion for summary judgment as to Safarik.

### E.     POD Deputy Lisa Williams

From 11:00 p.m. on March 9 to 7:00 a.m. on March 10, Williams was the POD 1 deputy. Plaintiffs note that Williams did not report in her DAL that (1) Bruner did not eat breakfast that morning, (2) Bruner was coughing and vomiting repeatedly or (3) Bruner needed medical attention. See Doc. #283 at 81. Again, plaintiffs have presented no evidence which suggests that Williams personally observed or was aware of any of these alleged facts. Williams testified that she did not recall Bruner and that if Bruner had appeared ill or someone had reported that he was ill, she would have noted that fact on the DAL. Williams concluded that Bruner did not appear ill during her shift and that she received no report that Bruner was ill. Williams performed two or three physical rounds during her shift, but plaintiffs have presented no evidence that she observed anything unusual about Bruner during her rounds. Because plaintiffs have not presented sufficient evidence to create a genuine issue of material fact that Williams knew of and disregarded an excessive risk to Bruner's health, the Court sustains defendants' motion for summary judgment as to Williams.

**F.     Sergeants Pewewardy, Brown, Schecter, Freeman And Taylor**

Plaintiffs argue that Bruner's deteriorating physical condition would have been obvious to Sergeants Pewewardy, Brown, Schecter, Freeman and Taylor, and that these individuals or their subordinates "should have observed the same signs of a serious medical condition as the inmates and the Stanton deputies did." Plaintiffs' Memorandum In Opposition (Doc. #283) at 74. Plaintiffs' argument that sergeants "should have observed" certain signs is insufficient to show deliberate indifference to Bruner's medical needs. Plaintiffs do not present specific evidence that these sergeants or their subordinates saw symptoms of a serious medical condition or received inmate reports of such symptoms. The Court therefore sustains defendants' motion for summary judgment as to Pewewardy, Brown, Schecter, Freeman and Taylor.

**G.     POD Deputy Mary Staton**

At approximately 7:15 a.m., Staton saw that Bruner appeared confused. Staton sent him back to his cell to retrieve his linens. She unlocked the cell door several times, but each time Bruner would open his cell door and then shut it without entering his cell. She had to call two roving deputies to escort Bruner back to his cell. Before 10:25 a.m., inmate Snider reported that Bruner had not eaten since he arrived in POD 1. Staton noted that Bruner had arrived four days earlier. Staton told her supervisor, Martinez, about Bruner's behavior and said that an inmate had reported that Bruner had not eaten for three days. At around noon, Staton determined that Bruner again did not eat his lunch. Inmate Ogunbiyi also reported to Staton that Bruner had not eaten for days. Staton also learned around noon that Bruner was unresponsive. Viewing the evidence in the light most favorable to plaintiffs, it was obvious to Staton that Bruner faced a risk of a serious medical condition and she chose to disregard that risk. Instead of addressing that immediate potential medical risk, Staton waited some three hours for mental health personnel. At 2:00 p.m., several

inmates advised Staton that Bruner was lying on the floor of his cell and not moving.  Instead of notifying the clinic of the immediate need for a medical (or mental health) evaluation, Staton asked Jameson to check on Bruner.  At approximately 2:20 p.m., Jameson told Staton that Bruner was "not doing good" and that something was wrong with him.  Viewing the evidence in the light most favorable to plaintiffs, a reasonable jury could find that by noon on March 9, Staton had been exposed to enough information concerning the serious risk of harm to Bruner that she must have known about it.  Farmer, 511 U.S. at 842; Clouthier v. County of Contra Costa, 591 F.3d 1232, 1245 (9th Cir. 2010).  The Court therefore overrules defendants' motion for summary judgment as to Staton.

### H.    Roving Deputies Marque Jameson And Michael Murphy

Between 7:20 a.m. and 7:50 a.m. on March 10, at Staton's request, Jameson and Murphy helped Bruner walk back to his cell.  Jameson and Murphy noticed that even though Bruner complied with their orders, he appeared in a daze, was acting strangely and moving extremely slowly.  Plaintiffs apparently argue that Jameson and Murphy should have contacted the clinic at this time.  When Jameson and Murphy escorted Bruner back to his cell, however, he did not appear to be in pain or distress.  They believed that Bruner had a mental health condition and did not need emergency care from a medical provider.  Plaintiffs do not explain how Jameson or Murphy would have known of the risk of a serious medical condition at this point.  As to the suspected mental health condition, Jameson and Murphy understood that Staton, as deputy in charge of POD 1 at that time, would address the matter.  Because Murphy had no other contact with Bruner, the Court sustains defendants' motion for summary judgment as to Murphy.

At approximately 2:11 p.m. on March 10, at Staton's request, Jameson went into Bruner's cell and found him lying on the floor in a pile of trash, curled up in the fetal position.  Bruner was

trying or struggling to get up.  Plaintiffs contend that Jameson should have contacted the clinic at this time.  Viewing the evidence in a light most favorable to plaintiffs, a reasonable jury could find that Bruner was unresponsive when Jameson found him on the floor and that his need for an immediate medical evaluation for a serious health condition was obvious to Jameson.[45]  Instead of contacting the clinic or notifying Staton of the immediate need for a medical evaluation, Jameson put Bruner back in his bunk and told Staton that Bruner was "not doing good" and that something was wrong with him.  Jameson did not alert Staton of the immediate need for a medical evaluation.  In light of Jameson's prior encounter with Bruner at 7:15 a.m., where he observed Bruner in a daze, a jury could find that Jameson was deliberately indifferent to the risk of a serious medical need when he found Bruner unresponsive and did not call for an immediate medical or mental health evaluation or ask Staton to do so.  The Court therefore overrules defendants' motion for summary judgment as to Jameson.[46]

### I.      Sergeant Martinez

At around 10:30 a.m. on March 10, Staton advised Martinez that Bruner appeared confused and another inmate had reported that he had not eaten for three days.  Martinez told Staton to ask ConMed mental health personnel to check on Bruner during rounds.  At around noon, Staton advised Martinez that Bruner did not eat his lunch and that he appeared depressed and antisocial.  Martinez asked Armstrong, a ConMed mental health nurse, to do a courtesy check on Bruner that afternoon during rounds.  Armstrong confirmed that based on her conversation with Martinez, both she and

---

[45]      At approximately 3:00 p.m., Staton reported to Skelton that Bruner had been unresponsive for a few hours.

[46]      Jameson and Staton also argue that they are entitled to qualified immunity because plaintiffs cannot establish a constitutional violation.  Because plaintiffs have presented sufficient evidence for a reasonable jury to find a constitutional, the Court overrules defendants' motion as to Jameson and Staton based on qualified immunity.

Martinez thought that the problem was a mental health issue rather than a medical emergency. See Armstrong Depo. at 46. As plaintiffs concede, Staton did not tell Martinez that Bruner needed immediate attention. See Doc. #283 at 82. Plaintiffs also have presented no evidence that Martinez knew that Bruner was unresponsive. Based on the non-emergent nature of the reports by Staton, Martinez asked ConMed mental health personnel to check on Bruner during rounds that afternoon. Plaintiffs have not presented evidence sufficient to create a genuine issue of material fact that Martinez knew of a substantial risk of harm to Bruner's health and chose to ignore it. See Parker v. Lee Cnty, Miss., No. 09-cv-71-JAD, 2010 WL 5146807, at *5 (N.D. Miss. Dec. 13, 2010) (corrections officer who was told that inmate had flu and asked nurse to assist him the day before he died, not deliberately indifferent even though inmate later complained that he thought something was terribly wrong with him and was afraid he might die; officer did not appreciate that inmate was in critical need of medical attention); see also Freeman v. Strack, No. 99 Civ. 9878(AJP), 2000 WL 1459782 at *9 (S.D.N.Y. Sept. 29, 2000) (no Eighth Amendment claim against nurse for two hour delay in scheduling appendectomy where nothing in medical history would have put nurse on notice that plaintiff was suffering from onset of appendicitis and no evidence that officer gave nurse any reason to believe emergency on hand). Accordingly, the Court sustains defendants' motion for summary judgment as to Martinez.

## II.    Supervisory Liability Claims Against Sedgwick County Sheriffs

Plaintiffs allege that Sheriff Hinshaw and Sheriff Steed in their individual capacities failed to properly train and supervise the Sedgwick Jail officers, deputies and sergeants. In particular, plaintiffs allege that the Sheriffs failed to train and supervise their employees as follows:

> (1) to ensure that an inmate's serious medical needs are timely and properly tended to, (2) the dangers of an inmate not eating, (3) inmate health and safety, (4) inmate mental health issues, (5) how to recognize behaviors that are a result of brain injuries or infections, (6) how to deal with inmates that have brain injuries or infections, (7) how to recognize mental illness or psychological trauma, (8) how to recognize

bacterial meningitis/sepsis or how to deal with it, (9) current ACA standards with regard to health treatment of prisoners in jail, (10) to ensure the completion of a medical pre-screen upon all inmates transferred and/or returned to the correctional facility, (11) to ensure that each inmate is medically screened by a qualified medical person within the first twenty four hours of transfer and/or return to the correctional facility, (12) to ensure medical staff are advised of an inmate who has been transferred and/or returned to the correctional facility by receipt of the intake screening Form 00C040 completed by the intake officers, . . . (13) to ensure that intake screenings are conducted prior to cell assignments [and (14)] failed to provide any continuing education to their employees on inmate's rights to basic health.

Pretrial Order (Doc. #294) at 11-12.

Absent an underlying constitutional violation, plaintiffs cannot assert a supervisory liability claim. See Fogarty v. Gallegos, 523 F.3d 1147, 1162 (10th Cir. 2008) (supervisory liability requires constitutional deprivation linked to supervisor's personal participation); see also Christensen v. Big Horn Cnty. Bd. of Cnty. Comm'rs, 374 Fed. Appx. 821, 827 (10th Cir. 2010) (absent underlying constitutional violation, sheriff and county commissioners cannot be held derivatively liable); Beggs, 563 F.3d at 1091-92 (where individual county defendants did not violate jail inmate's constitutional rights, Sheriff not liable as a matter of law for policy, training or supervision). Accordingly, plaintiffs' claims for failure to train or supervise are limited to the potential underlying constitutional violations by Staton and Jameson.

Section 1983 does not authorize liability under a theory of respondeat superior. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). To establish supervisory liability, plaintiffs must establish that (1) defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy, (2) the policy caused the alleged constitutional harm and (3) defendant acted with the state of mind required to establish the alleged constitutional deprivation. Dodds, 614 F.3d at 1199.

Defendants argue that plaintiffs have not presented sufficient evidence as to causation or intent. Plaintiffs respond to these arguments in conclusory fashion and do not set forth specific

evidence on either element.  As to causation, plaintiffs must show an affirmative link between the constitutional deprivation and the supervisor's personal involvement.  Dodds, 614 F.3d at 1200-01; see Barrett v. Orman, 373 Fed. Appx. 823, 826 (10th Cir. 2010); Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009).  To do so, plaintiffs can show that defendants set in motion a series of events that they knew or reasonably should have known would cause others to deprive Bruner of his constitutional rights.  Dodds, 614 F.3d at 1195-96.  Plaintiffs do not explain how Sheriffs Hinshaw or Steed were personally involved in the alleged deficiencies in the training program or how those deficiencies are related to the alleged constitutional violations by Staton and Jameson.  The potential constitutional violations by Staton and Jameson involve a failure to immediately seek medical attention in light of a medical condition that was so obvious that "a lay person would [have] easily recognize[d] the necessity of a doctor's attention."  Doc. #283 at 2.  Plaintiffs have not presented sufficient evidence to establish an affirmative link between the involvement of Sheriffs Hinshaw and Steed in the training program and any indifference to Bruner's serious medical needs by Staton or Jameson.

As to intent, plaintiffs have not shown that Sheriffs Hinshaw and Steed acted with deliberate indifference.  Plaintiffs must establish that Sheriffs Hinshaw and Steed acted knowingly or with deliberate indifference that a constitutional violation would occur.  Dodds, 614 F.3d at 1196.  Plaintiffs have not attempted to show that Sheriffs Hinshaw and Steed had any contact with Bruner or notice that their subordinates had any contact with him.  Plaintiffs also have not shown that Sheriffs Hinshaw and Steed were aware that any deficiency in the training program caused any other inmates not to receive necessary medical care.  As in the context of municipal liability, without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.  See Connick v. Thompson, 131 S. Ct. 1350, 1360 (2011) (pattern of similar constitutional violations by

untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train against supervisor in official capacity) (citing <u>Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown</u>, 520 U.S. 397, 409 (1997)). Here, plaintiffs have not shown a pattern of similar constitutional violations or otherwise presented evidence to create a genuine issue of material fact whether Sheriffs Hinshaw and Steed acted with deliberate indifference to Bruner's serious medical needs.

The Court therefore sustains defendants' motion for summary judgment as to Sheriffs Hinshaw and Steed in their individual capacities.

### III.   Claims Against Sheriff Hinshaw In His Official Capacity

A local governmental entity may be liable under Section 1983 if it "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. See <u>Connick</u>, 131 S. Ct. at 1359; <u>Monell</u>, 436 U.S. at 692. Under Section 1983, local governments are responsible only for "their own illegal acts." <u>Pembaur v. Cincinnati</u>, 475 U.S. 469, 479 (1986) (citing <u>Monell</u>, 436 U.S. at 665-83). They are not vicariously liable under Section 1983 for acts by employees. <u>See Monell</u>, 436 U.S. at 691. To impose liability on the County under Section 1983, plaintiffs must prove that "action pursuant to official municipal policy" caused Bruner's injury. See <u>Connick</u>, 131 S. Ct. at 1359; <u>Monell</u>, 436 U.S. at 691. Official policy includes decisions of the County's lawmakers, acts of its policymaking officials and practices so persistent and widespread as to practically have the force of law. See <u>id.</u>

In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of Section 1983. See <u>Connick</u>, 131 S. Ct. at 1359. A local government's "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." <u>Id.</u> (citation omitted). To satisfy the statute, a municipality's failure to train must amount

to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." Id. (quoting City of Canton, 489 U.S. at 388). Deliberate indifference is a stringent standard of fault, i.e. it requires proof that a municipal actor disregarded a known or obvious consequence of his or her action. See Connick, 131 S. Ct. at 1360 (citing Bryan Cnty., 520 U.S. at 410). Thus, when policymakers are on actual or constructive notice that a particular omission in the training program causes county employees to violate citizens' constitutional rights, the county may be deemed deliberately indifferent if the policymakers choose to retain that program. Connick, 131 S. Ct. at 1360 (citing Bryan Cnty, 520 U.S. at 407).

As with the supervisory liability claims against Sheriffs Hinshaw and Steed in their individual capacities, plaintiffs' claims against Sheriff Hinshaw in his official capacity are limited to the potential underlying constitutional violations by Staton and Jameson. See Christensen, 374 Fed. Appx. at 827; Martinez, 563 F.3d at 1091-92.

### A.       Policies And Customs

Plaintiffs claim that the County (through Hinshaw in his official capacity) is liable under Section 1983 because it created or maintained unconstitutional policies or customs. In particular, plaintiffs allege that the policies and the procedures of the County and the Sheriff were flawed because those policies and procedures failed to address the following:

> (1) inmates who were incapable of signing up for the "sick call" due to health reasons, (2) a procedure to ensure that an inmate attends his "sick call" appointment, (3) a follow-up procedure for inmates who do not appear for their scheduled "sick call" appointment, (4) a procedure to ensure that inmates transferred and/or returned to the Sedgwick County Detention Facility due to medical issues had their medical issues promptly addressed, (5) the health status of inmates transferred and/or returned to the Sedgwick County Detention Facility from out-of-county facilities, (6) a procedure to ensure that the health staff were promptly notified of the arrival of an inmate who was transferred and/or returned to the Sedgwick County Detention Facility due to medical issues, (7) a procedure delineating how and when the health staff would be informed about inmates proposed for transfer from another facility, and (8) the responsibilities of corrections staff and health staff when arranging for the transfer and/or return of an inmate with medical issues to the Sedgwick County

Detention Facility from another facility.

Pretrial Order (Doc. #294) at 12-13.  Plaintiffs also allege that the policies and procedures of the County and the Sheriff were flawed because (1) they failed to ensure that the national correctional standards were adhered to with the performance of a medical screening and assessment by qualified healthcare professionals on every inmate who was transferred or returned to the Sedgwick Jail, regardless of the reason for the transfer or return, (2) it was the custom and policy of the County and Sheriff not to provide medical care to inmates unless the inmates specifically requested medical care, (3) it was the custom and policy of the County and Sheriff that if an inmate did not request medical care, medical care would be refused no matter what the circumstances, (4) it was the custom and policy of the County and the Sheriff not to permit a corrections officer or deputy to contact the clinic about an inmate without first going through a supervisor.  Pretrial Order (Doc. #294) at 13.

Sheriff policy required that inmates receive necessary medical care without delay.[47]  Deputies were expected to use their common sense when responding to an inmate request or known need for medical attention.  If an inmate appeared ill or the deputy otherwise recognized the need for medical attention, but no emergency was apparent, the deputy would (1) advise the inmate to place his name on sick call, (2) contact a supervisor for instruction and/or (3) call ConMed.  In the event of an apparent emergency, the deputy could call a Code 1, an emergency radio code alerting ConMed to respond immediately.  On this record, plaintiffs have not demonstrated a genuine issue of fact that

---

[47]     Sheriff's General Order 117.00, Paragraph I provided, in part as follows:

Each inmate in the Sedgwick County Detention Facility will be provided medical care from the time of admission throughout their period of incarceration.  The operation of medical staff shall be under the direction of the contracted medical service and administered by the Administrative Lieutenant.  All operations shall be consistent with accepted medical policies and procedures within the correctional/detention setting.

a County custom, practice or policy caused the alleged constitutional violations by Staton and

Jameson.  Defendants are therefore entitled to summary judgment on this claim.

> **B.**     **Failure To Train Or Supervise**

Plaintiffs also claim that the County (through Hinshaw in his official capacity) is liable for

the failure to train and/or supervise Sedgwick Jail employees.  Plaintiffs argue that the County failed

to properly train and supervise its employees in the same areas set forth above as to Sheriffs Hinshaw

and Steed.

Plaintiffs must identify a specific deficiency in the training program that was so obvious and

closely related to Bruner's injury that it might fairly be said that the official policy or custom was

both deliberately indifferent to his constitutional rights and the moving force behind his injury.

Porro v. Barnes, 624 F.3d 1322, 1328 (10th Cir. 2010); Lopez v. LeMaster, 172 F.3d 756, 760 (10th

Cir. 1999); see City of Canton, 489 U.S. at 385.  The Supreme Court has explained the possibility

of liability under a failure to train theory as follows:

> The issue . . . is whether that training program is adequate; and if it is not, the
> question becomes whether such inadequate training can justifiably be said to
> represent "city policy."  It may seem contrary to common sense to assert that a
> municipality will actually have a policy of not taking reasonable steps to train its
> employees.  But it may happen that in light of the duties assigned to specific officers
> or employees the need for more or different training is so obvious, and the
> inadequacy so likely to result in the violation of constitutional rights, that the
> policymakers of the city can reasonably be said to have been deliberately indifferent
> to the need.  In that event, the failure to provide proper training may fairly be said to
> represent a policy for which the city is responsible, and for which the city may be
> held liable if it actually causes injury.

City of Canton, 489 U.S. at 390 (footnotes omitted).  Deliberate indifference is established when "the

need for more or different training is so obvious, and the inadequacy so likely to result in the

violation of constitutional rights, that the policymakers of the city can reasonably be said to have

been deliberately indifferent to the need."  Id. at 388-89.

A municipality's culpability for a deprivation of rights is at its most tenuous where a claim

turns on a failure to train. <u>Connick</u>, 131 S. Ct. at 1359. A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of a failure to train claim against a municipality. <u>Id.</u> at 1360 (quoting <u>Bryan Cnty.</u>, 520 U.S. at 409). Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights. <u>Id.</u>

Here, plaintiffs have not shown any prior constitutional violations so as to establish a pattern. Moreover, they have not presented sufficient evidence for a reasonable jury to find liability based on a single incident. <u>Connick</u>, 131 S. Ct. at 1361 (2011); <u>Canton</u>, 489 U.S. at 390. The Supreme Court has described the "narrow range of circumstances" where such a theory may be viable as follows:

> a pattern of similar violations might not be necessary to show deliberate indifference. <u>Canton</u>; <u>Bryan Cty.</u>, <u>supra</u>, at 409. The Court posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force. <u>Canton</u>, <u>supra</u>, at 390, n.10, 109 S. Ct. 1197. Given the known frequency with which police attempt to arrest fleeing felons and the "predictability that an officer lacking specific tools to handle that situation will violate citizens' rights," the Court theorized that a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the "highly predictable consequence," namely, violations of constitutional rights. <u>Bryan Cty.</u>, <u>supra</u>, at 409, 117 S. Ct. 1382. The Court sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations.

<u>Connick</u>, 131 S. Ct. at 1361. The failure to train deputies in common sense about when to contact the clinic for immediate medical attention does not fall within the narrow range of <u>Canton</u>'s hypothesized single-incident liability. In particular, plaintiffs have not shown that the alleged failure of officers to use their common sense in summoning medical attention was a highly predictable consequence of not training Jameson and Staton in specific areas (such as identifying the signs and

symptoms of specific medical conditions).  For these reasons, the Court sustains defendants' motion for summary judgment as to Sheriff Hinshaw in his official capacity.

**IV.     Claims Against Individual ConMed Defendants**

Accidental or inadvertent failure to provide adequate medical care, or negligent diagnosis or treatment do not constitute a medical wrong under the Eighth Amendment.  Ramos, 639 F.2d at 575; see Estelle, 429 U.S. at 104 (inadvertent failure to provide adequate medical care cannot be said to constitute unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind so as to violate the Eighth Amendment).  This principle applies equally to medical personnel other than doctors, including nurses examining prisoners for immediate treatment and/or referral for further examination by a physician.  See Christensen, 374 Fed. Appx. at 827-28; see also Self v. Crum, 439 F.3d 1227, 1231 (10th Cir. 2006); Sealock, 218 F.3d at 1208, 1211, 1212 n.7 (10th Cir. 2000); Boyett v. Cnty. of Wash., 282 Fed. Appx. 667, 675-76 (10th Cir. 2008).  Even so, a prison health official who serves solely as a "gatekeeper for other medical personnel capable of treating the condition" may be held liable under the deliberate indifference standard if she "delays or refuses to fulfill that gatekeeper role."  Mata, 427 F.3d at 751 (quoting Sealock, 218 F.3d at 1211).

**A.     Joyce Beyrle**

On the morning of March 5, 2008, Beyrle knew that Bruner had bloody stools, had not been eating for two days and had some weakness.  Beyrle testified that she did not think that these symptoms were unusual and they were not presented to her in an emergent manner.  Beyrle quickly reported the symptoms to the physician assistant on duty, William Wondra, who decided to have deputies bring Bruner back to the Sedgwick Jail.  Beyrle simply followed the directions of Wondra, the physician assistant on duty, who did not recommend to have Bruner sent to a local hospital in Stanton County because it was not presented as an emergent situation.  See Beyrle Depo. at 49.

Plaintiffs present no evidence that Beyrle had some independent basis to believe that Bruner had symptoms of a rapidly progressing fatal condition such as acute meningitis and chose to disregard that risk. Likewise, no evidence suggests that Beyrle understood that by arranging to have Bruner transported back on March 6 rather than March 5, Bruner would be exposed to a substantial risk of serious harm. The Court therefore sustains defendants' motion for summary judgment as to Beyrle.[48]

**B.     Cassie (Leu) Looka**

Plaintiffs argue that Looka was deliberately indifferent to Bruner's serious medical needs because she scheduled an appointment for Bruner for 8:00 a.m. on March 9 even though the first appointment each day was not until 9:10 a.m.[49] Plaintiffs present some evidence that Looka scheduled a "chart review" for Bruner on March 9 at 8:00 a.m., but provide no evidence that she had any role other than inputting that event in the computer. In particular, plaintiffs present no evidence that Looka ever had any opportunity to observe or interact with Bruner or that she otherwise knew of his symptoms. Plaintiffs do not explain why Looka scheduled the chart review or any other circumstances surrounding the alleged error. Based on the limited record provided by plaintiffs related to Looka, it appears that at most, she made a scheduling error. A scheduling error, by itself, does not constitute deliberate indifference to Bruner's serious medical needs. See Duffield v. Jackson, M.D., 545 F.3d 1234, 1238 (10th Cir. 2008) (medical malpractice does not become

---

[48]     Plaintiffs also contend that Beyrle made no efforts to ensure that the clinic was alerted when Bruner arrived back at the Sedgwick Jail so that he could receive medical attention. Plaintiffs have produced no evidence to support this allegation or to show that Beyrle was on duty or available to follow up when Bruner arrived back at the Sedgwick Jail on March 6, 2008, or at any time thereafter through March 10, 2008. See Beyrle Depo. at 74-75 (Beyrle not present when Bruner returned to Sedgwick Jail).

[49]     Plaintiffs also argue that Looka was deliberately indifferent because she scheduled an appointment for Bruner on the morning of March 6 even though Bruner was not scheduled to return to the Sedgwick Jail until late afternoon that same day. The uncontroverted evidence shows that Amy Rodman-Riggs, not Looka, scheduled Bruner for an appointment for the morning of March 6.

constitutional violation merely because victim is prisoner).  The Court sustains defendants' motion as to Looka.

### C.      Charles Fletcher

On March 10, when Bruner arrived in the clinic, Fletcher, a physician assistant, ordered a nurse to set up an IV and ordered blood tests.  Fletcher later conducted a physical examination, ordered the nurse to administer IV fluids to treat a suspected liver condition, reviewed lab results, ordered the nurse to administer IV antibiotics and ordered that Bruner be transferred to a local hospital.  Viewed in a light most favorable to plaintiffs, the record does not support a finding that Fletcher was deliberately indifferent to Bruner's serious medical needs.  See Duffield, 545 F.3d at 1238-39 (affirming dismissal of Section 1983 claims against physician who examined prisoner, ordered diagnostic tests and prescribed several different medications); Sealock, 218 F.3d at 1208, 1211, 1212 n.7 (subjective component not met where prison nurse misdiagnosed chest pains as the flu and failed to recognize symptoms suggesting impending heart attack); Freeman, 2000 WL 1459782 at *9 (no Eighth Amendment claim against nurse for two-hour delay in scheduling appointment where nothing in medical history would have put nurse on notice that plaintiff was suffering from onset of appendicitis and no evidence that officer gave nurse any reason to believe emergency on hand); see also Estelle, 429 U.S. at 106 (prison doctor's negligent diagnosis or treatment of medical condition does not violate Eighth Amendment).  The Court therefore sustains defendants' motion for summary judgment as to Fletcher.[50]

### D.      Lisa Armstrong And Andrea Skelton

Plaintiffs assert that by not obtaining timely medical attention, Armstrong and Skelton were deliberately indifferent to Bruner's serious medical needs.  See Doc. #285 at 54.  At approximately

_____

[50]      Plaintiffs also maintain that on March 5, Fletcher made the initial decision to have Bruner brought back to the Sedgwick Jail.

10:25 a.m. on March 10, Staton asked Skelton to do a mental health check on Bruner. Skelton told Staton that she could see Bruner that afternoon when they conducted rounds. Shortly after noon, Martinez contacted Armstrong and asked her to do a courtesy check on Bruner when she did her rounds. At approximately 2:45 p.m., Martinez contacted Skelton and asked to have someone check on Bruner. Shortly thereafter, Armstrong and Skelton went into Bruner's cell. After a quick assessment, Armstrong went to the POD booth, called the clinic and asked that someone bring a wheelchair immediately to pick up Bruner so that he could be evaluated by the physician assistant. Before 2:45 p.m., Staton and Martinez simply asked Armstrong and Skelton to check on Bruner. Staton and Martinez did not express any objection when Armstrong and Skelton said that they would do so during afternoon rounds. Plaintiffs have not presented evidence to create a genuine issue of material fact that before 2:45 p.m., Armstrong and Skelton knew of an excessive risk of harm to Bruner's health and drew an inference that such a risk existed. In addition, based on the non-emergent nature of the calls from Staton and Martinez, any risk to Bruner's physical health was not obvious to Armstrong or Skelton before 2:45 p.m. For these reasons, the Court sustains defendants' motion for summary judgment as to Armstrong and Skelton.

### E.      Kendra (Maechtlen) Wolff And Alicia Mefford

Plaintiffs do not precisely explain their theory of personal liability against Wolff, the ConMed Health Services Administrator, or Mefford, the ConMed Director of Nursing. Wolff did not learn about the events concerning Bruner until after Bruner was in the hospital. Likewise, Mefford did not render any medical care to Bruner and she was not informed of his condition on March 10. Plaintiffs do not explain or show how Wolff or Mefford was deliberately indifferent to Bruner's serious medical needs. The Court therefore sustains defendants' motion for summary judgment as to plaintiffs' claims of personal liability against Wolff and Mefford.

F.      **Plaintiffs' Supervisory Claims Against Wolff And Mefford**

Plaintiffs also assert a claim of supervisory liability against Wolff and Mefford.  In particular,

plaintiffs allege that Wolff and Mefford failed to train and supervise their employees as follows:

(1) that they must take the patient's safety into consideration when scheduling an
appointment, (2) proper appointment scheduling, (3) to ensure that an inmate's name
is included on the daily printout of the "sick call" schedule, (4) the dangers of a
patient not eating, (5) what to do if inmates get hurt, (6) inmate health and safety, (7)
mental health issues, (8) how to recognize behaviors that are a result of brain injuries
or infections, (9) how to deal with inmates that have brain injuries or infections, (10)
how to recognize mental illness or psychological trauma, (11) how to recognize
bacterial meningitis/sepsis or how to deal with it, (12) the administration of
psychotropic medications to inmates who were a danger to themselves, (13) quality
service, (14) current ACA standards with regard to health treatment of prisoners in
jail, (15) to ensure that a thorough and complete "Pass-On" report sheet is completed
at the end of each shift and provided to the on-coming shift, (16) to ensure the
completion of a medical pre-screen upon all inmates transferred and/or returned to
the correctional facility, (17) to ensure that each inmate is medically screened by a
qualified medical person within the first twenty four hours of transfer and/or return
to the correctional facility, (18) to ensure medical staff are advised of an inmate who
has been transferred and/or returned to the correctional facility by receipt of the
intake screening Form 00C040 completed by the intake officers, . . . (19) to ensure
that intake screenings are conducted prior to cell assignments [and (20)] to provide
any continuing education to Conmed employees on inmate's rights to basic health.

Pretrial Order (Doc. #294) at 15-16.  In their opposition brief, plaintiffs state their theory as follows:

At all times relevant, [Wolff] was the administrative supervisor over the medical and
mental health division at the Sedgwick County Jail.  [Wolff] allegedly conducted her
own investigation of the Bruner incident, but failed to talk to all of the relevant
involved persons.  Ultimately, [Wolff] blamed [Looka] for her failure to schedule
Bruner's appointments properly; however, [Wolff] never spoke to [Looka] regarding
the incident to determine what transpired.

At all times relevant, Alicia Mefford was the director of nursing at the Sedwick
County Jail.  Mefford failed to ensure that the nurses were following protocol by
following up with inmates who had been scheduled in the clinic but had not been
seen, including Bruner.  Mefford failed to ensure that Cassie [Looka] was properly
trained and was following procedures for the scheduling of appointments.

Doc. #285 at 54.

Because plaintiffs have not created a genuine issue of material fact on any of their claims for

personal liability against individuals associated with ConMed, they cannot maintain a supervisory

liability claim against Wolff and Mefford.  See Fogarty, 523 F.3d at 1162; see also Christensen, 374 Fed. Appx. at 827; Martinez, 563 F.3d at 1091-92.  Even if the Court assumes that plaintiffs could maintain their claims for personal liability, they cannot withstand defendants' motion for summary judgment on their claim for supervisory liability.  As explained above, to establish supervisory liability, plaintiffs must establish that (1) defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy (2) the policy caused the alleged constitutional harm and (3) defendant acted with the state of mind required to establish the alleged constitutional deprivation.  Dodds, 614 F.3d at 1199.

Plaintiffs have not presented evidence that Wolff or Mefford had any duty or responsibility to train or supervise any other specific ConMed employees.  Plaintiffs identify numerous topics for potential training, but do not relate these topics to Wolff or Mefford.  Plaintiffs also do not present evidence of a causal connection between any alleged failure to train and supervise by Wolff and Mefford and the purported constitutional violations by ConMed employees.  Finally, plaintiffs do not explain or offer facts to show how Wolff and Mefford knew of an excessive risk of harm to Bruner's health based upon training and supervision deficiencies, or that they made any inferences concerning such a risk.  For these reasons, the Court sustains defendants' motion for summary judgment as to the supervisory claims against Wolff and Mefford.

## V.    Claims Against ConMed Corporate Entities

Because plaintiffs have not created a genuine issue of material fact on any of their claims for personal liability against individuals associated with ConMed, they cannot maintain a municipal liability claim against ConMed.[51]  See Christensen, 374 Fed. Appx. at 827; Martinez, 563 F.3d at

---

[51]    As a private corporation performing municipal duties, ConMed is subject to liability under Section 1983 to the same extent as a municipality.  See DeVargas v. Mason & Hangar-Silas Mason Co., Inc., 844 F.2d 714, 723 (10th Cir. 1988) (Monell applies equally to corporate (continued...)

1091-92.  Even if the Court assumes that plaintiffs could maintain their claims for personal liability,

they cannot withstand defendants' motion for summary judgment on their claims against the

ConMed corporate entities.

### A.        Policies And Customs

Plaintiffs allege that the policies and the procedures of ConMed were flawed because those

policies and procedures failed to address the following:

> (1) inmates who were incapable of signing up for the "sick call" due to health
> reasons, (2) a procedure to ensure that an inmate attends his "sick call" appointment,
> (3) a follow-up procedure for inmates who do not appear for their scheduled "sick
> call" appointment, (4) a procedure to ensure that inmates transferred and/or returned
> to the Sedgwick County Detention Facility due to medical issues had their medical
> issues promptly addressed, (5) the health status of inmates transferred and/or returned
> to the Sedgwick County Detention Facility from out-of-county facilities, (6) a
> procedure to ensure that the health staff were promptly notified of the arrival of an
> inmate who was transferred and/or returned to the Sedgwick County Detention
> Facility due to medical issues, (7) a procedure delineating how and when the health
> staff would be informed about inmates proposed for transfer from another facility,
> and (8) the responsibilities of corrections staff and health staff when arranging for the
> transfer and/or return of an inmate with medical issues to the Sedgwick County
> Detention Facility from another facility.  The policies and procedures were also
> flawed because they failed to ensure that (1) a full and complete disclosure of an
> inmate's "current medical problems" is provided to the receiving facility when an
> inmate is transferred so as to ensure a continuity of care, (2) the Clinic was fully
> staffed in accordance with the requirements of the contract with Sedgwick County
> Jail and Detention Facility, and (3) the national correctional standards were adhered
> to with the performance of a medical screening and assessment by qualified
> healthcare professionals on every inmate who was transferred and/or returned to the
> Sedgwick County Detention Facility, regardless of the reason for the transfer and/or
> return.

Pretrial Order (Doc. #294) at 16-18.  Plaintiffs also assert that it was the custom and policy of

ConMed, Inc. and ConMed Healthcare Management, Inc. (1) not to provide medical care to inmates

unless the inmates specifically requested medical care, (2) to withhold medications from the inmates

---

[51](...continued)
defendants).

because it was cost effective and (3) to discourage personnel from providing medical care to inmates in order to keep costs down.  Id.

Defendants argue that plaintiffs have not presented sufficient evidence of (1) an official policy or custom, (2) causation or (3) intent.  The Court need not reach the issue of causation because plaintiffs have not presented sufficient evidence to create a genuine issue of material fact on the other two elements.  As to an official policy or custom, plaintiffs have not identified the ConMed decisionmaker with final authority to set policy who allegedly failed to create or implement the above policies and procedures.  See Pembaur, 475 U.S. at 481 (municipal liability only attaches where official responsible for establishing policy makes deliberate choice to follow course of action among various alternatives).  Plaintiffs also have not presented sufficient evidence to create a genuine issue of material fact on any of their "custom" claims.

As to intent, plaintiffs do not respond to defendants' argument.  Plaintiffs have not identified the ConMed decisionmaker responsible for establishing policy so they can hardly show that the decisionmaker acted with deliberate indifference.  In any event, plaintiffs have not presented evidence that any ConMed employee disregarded a known or obvious consequence of his or her action.  See Connick, 131 S. Ct. at 1360 (citing Bryan Cnty., 520 U.S. at 410).  Absent admissible evidence on which a reasonable juror could find in favor of plaintiffs on this element, the Court must sustain defendants' motion for summary judgment.  See Celotex, 477 U.S. at 322 (summary judgment may be entered against party who fails to make sufficient showing to establish existence of element essential to that party's case); Hall, 935 F.2d at 1111 (once movant points out absence of proof on essential element of nonmovant's case, burden shifts to nonmovant to provide contrary evidence); Applied Genetics, 912 F.2d at 1241 (nonmoving party may not rest on pleadings but must set forth specific facts showing genuine issue for trial as to dispositive matters for which it carries burden of proof).

Defendants are entitled to summary judgment on plaintiffs' policy, practices or custom claim against the ConMed corporate entities.

## B.     Failure To Train Or Supervise

Plaintiffs allege that ConMed failed to properly train and supervise its employees in the same 20 areas set forth above as to Wolff and Mefford.  For substantially the same reasons as those identified above as to Wolff or Mefford, defendants are entitled to summary judgment on this claim as well.  In particular, plaintiffs do not present evidence of a causal connection between any alleged failure to train and supervise by ConMed and the purported constitutional violations by ConMed employees.  Plaintiffs also do not identify any ConMed employee who knew of an excessive risk of harm to Bruner, or inmates generally, based upon training and supervision deficiencies, or establish that they made any inferences concerning such a risk.  For these reasons, the Court sustains defendants' motion for summary judgment as to plaintiffs' failure to train or supervise claim against the ConMed corporate entities.

**IT IS THEREFORE ORDERED** that the ConMed Defendants' Joint Motion For Summary Judgment (Doc. #269) filed September 23, 2011 be and hereby is **SUSTAINED**.

**IT IS FURTHER ORDERED** that the Motion For Summary Judgment (Doc. #270) filed September 23, 2011 by the Sedgwick County Defendants be and hereby is **SUSTAINED in part**. The Court sustains defendants' motion as to (1) the claims of Tera Bruner-McMahon and Jesse A. Bruner, as heirs at law of Terry Bruner, against all defendants and (2) the claims of Tera Bruner-McMahon, as administrator of the estate of Terry Bruner, against Robert Hinshaw in his official and individual capacities, Gary Steed, Wayne E. Brown, Mark B. Cook, Rhonda M. Freeman, Rachel M. Gaines, Ted Gibson, Bobby L. Hines, Timothy McMahon, Michael Murphy, Lisa M. Perez, Gerald Pewewardy, Lisa R. Price, Daniel M. Safarik, Jared O. Schecter, Abdul S. Smith, Robert D.

Taylor and Lisa Williams.  The Court overrules defendants' motion as to the claims of Tera Bruner-McMahon, as administrator of the estate of Terry Bruner, against Marque Jameson and Mary Staton.

The claims of Tera Bruner-McMahon, as administrator of the estate of Terry Bruner, against Marque Jameson and Mary Staton under 42 U.S.C. § 1983 for deliberate indifference to Bruner's serious medical needs remain for trial.

Dated this 18th day of January, 2012 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge
