**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **TERA M. BRUNER-McMAHON and** | ) | |
| **KATHLEEN A. GULLEDGE, as** | ) | |
| **Co-Administrators of the Estate of** | ) | |
| **TERRY ALBERT BRUNER, Deceased,** | ) | **CIVIL ACTION** |
| | ) | |
| **Plaintiffs,** | ) | **No. 10-1064-KHV** |
| **v.** | ) | |
| | ) | |
| **MARY STATON and MARQUE JAMESON,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM AND ORDER**

The co-administrators of the estate of Terry Albert Bruner, a former inmate at the Sedgwick

County Adult Detention Facility in Wichita, Kansas ("Sedgwick Jail"), filed suit under 42 U.S.C.

§ 1983 to recover money damages for the violation of Bruner's rights under the Eighth Amendment.

In particular, plaintiffs allege that two officers of the Sedgwick Jail in Wichita, Kansas, Mary Staton

and Marque Jameson, were deliberately indifferent to Bruner's serious medical needs.  The Court

held a jury trial as to Mary Staton and Marque Jameson.[1]  The jury returned a verdict in favor of

both defendants.  This matter is before the Court on Plaintiffs' Motion For New Trial (Doc. #428)

filed April 3, 2012.  For reasons stated below, the Court overrules plaintiffs' motion.

**Factual Background**

On November 5, 2007, Bruner was incarcerated in the Sedgwick Jail.  On November 8, 2007,

Bruner transferred to the Stanton County jail in Johnson, Kansas, some 260 miles from the Sedgwick

---

[1]        On October 12, 2011, the parties stipulated to the dismissal without prejudice of
plaintiffs' claims against several defendants including the County of Sedgwick and the Sedgwick
County Sheriff's Department.  See Partial Stipulation Of Dismissal (Doc. #277).  On January 18,
2012, the Court sustained the summary judgment motion as to numerous other defendants.  See
Memorandum And Order (Doc. #311).

Jail.  On March 5, 2008, after receiving a report from another inmate that Bruner was ill and after observing Bruner, two Stanton County jailers thought that Bruner appeared to be sick and in need of medical attention.  Stanton County officials contacted Sedgwick County officials who arranged for Bruner to be transported back to the Sedgwick Jail the next day, March 6, on the regular transport van.  Bruner arrived back at the Sedgwick Jail at 5:00 p.m. on March 6.  Bruner stayed in the booking area until he arrived at his assigned cell in POD 1 at approximately 4:15 a.m. on March 7.  Bruner did not have a cellmate.

POD 1 is a protective custody area for inmates who are not placed in general population. At all times, the POD deputy or a relief deputy remains in a booth which has a closed door, glass windows and a private bathroom.  The booth is in the middle of the POD, which allows the deputy to see the various sections of the POD and the inmates in the day rooms, as well as inmates who are moving or standing by the window in their cell doors.  Inmates can communicate with a deputy in the booth by intercoms when they are in their cells or through slots in the booth's glass when they are in the POD day rooms.  Deputies supervise inmates in POD 1 indirectly and generally allow them at their will to stay in their cells or remain outside of their cells for much of the day in common day rooms.  Except when an inmate is entering or exiting the cell, deputies keep cell doors closed and locked.  The POD deputy generally unlocks cell doors remotely from the booth.  Several times during a shift, a POD deputy or relief deputy conducts physical checks or rounds of inmates.  During these rounds, the deputy looks in the window of each cell and verifies that the inmate is present and alive.

From Bruner's arrival on March 6 through March 10, several deputies observed him.  Mark Cook, the POD 1 deputy from 7:00 a.m. to 3:00 p.m. on March 9, noted that Bruner was not eating, but he did not believe that Bruner needed medical care, had any kind of emergency medical condition or had a condition that would prevent him from telling a deputy if he needed medical

attention.

From 7:00 a.m. to 3:00 p.m. on March 10, Mary Staton was the POD 1 deputy.  Staton was also trained as a certified nurse assistant and had worked previously as a nurse's aid.  Staton did not know Bruner's medical history, did not have access to his medical records and did not know that he had been brought back from Stanton County or for what reason.  At approximately 7:15 a.m., Staton saw Bruner come out of his cell for linen exchange, but he did not have his linens.  Bruner appeared confused.  Staton sent him back into his cell to retrieve the linens.  She unlocked the cell door several times, but each time Bruner would open his cell door and then shut it without entering his cell.

Between 7:20 a.m. and 7:50 a.m., Staton asked Marque Jameson and Michael Murphy, who were roving deputies, to put Bruner back into his cell.  Jameson and Murphy helped Bruner walk to his cell.  Staton saw that Bruner went into his cell without incident.  Jameson and Murphy noticed, however, that even though Bruner complied with their orders, he appeared in a daze and was acting strange and moving extremely slowly.  Staton, Jameson and Murphy testified that they believed that Bruner had a mental health condition and did not need emergency care from a medical provider.  Jameson and Murphy understood that Staton, who was the deputy in charge of POD 1 at that time, would address the matter.  Bruner stayed in his cell the rest of the morning and did not ask to get out.

At some point between 7:15 a.m. and 10:25 a.m., inmate Brad Schneider told Staton that Bruner had not eaten since he arrived in POD 1.  Staton looked up when Bruner came to the POD and noted that he had returned to the Sedgwick Jail from out of county on March 6.  She testified that she continued to believe that Bruner's unusual actions and failure to eat were a result of a mental condition. She testified that she did not suspect that Bruner was physically ill or that he needed emergency care.

At approximately 10:25 a.m. on March 10, Staton told Martinez, her supervisor, about Bruner's behavior and that an inmate had reported that Bruner had not eaten for three days. Martinez instructed Staton to contact ConMed, Inc. ("ConMed"), which operated the clinic at the jail, for a mental health check. Staton called Andrea Skelton, LMSW (Licensed Master Social Worker), a mental health worker at ConMed, who told Staton that she could see Bruner when they did rounds that afternoon. Martinez told Staton to monitor whether Bruner ate his lunch.

At 11:50 a.m. on March 10, lunch was distributed to the inmates. Staton determined that Bruner did not eat his lunch. Staton entered this fact in her daily activity log and also entered it into Bruner's computer "inmate log" as a warning. Staton contacted Martinez and reported that Bruner had not eaten his lunch. Staton also reported that Bruner did not come out of his cell for lunch and appeared depressed and antisocial. Martinez notified Lisa Armstrong, R.N., a ConMed mental health nurse, and requested a "courtesy check" on Bruner when she did her rounds. Inmate Bamideld Ogunbiyi also reported to Staton that Bruner had not eaten for days. Staton testified that she still thought that Bruner's symptoms were the result of a mental problem.

Staton intended to "keep an eye" on Bruner until mental health performed its afternoon rounds. At approximately 2:00 p.m., several inmates advised Staton that Bruner was lying on the floor of his cell and not moving.[2] Staton called Jameson to check on Bruner. At 2:11 p.m., Jameson found Bruner in his cell, lying on the floor in a pile of trash, curled up in the fetal position. Where he was located in the cell, no one outside the cell could see him unless he or she was standing at the cell door. Bruner appeared to be in a daze, but Jameson testified that he did not think Bruner was in pain or distress. Bruner was struggling to get up. Jameson picked him up and placed him in his bunk. Staton could not see Bruner from the booth, but Jameson told her that Bruner was "not doing

---

[2]     Inmate Jay Uhls testified that shortly after lunch was served on March 10, he told Staton that Bruner was sick, but she responded that Bruner was faking it.

good" and that something was wrong with him.  Jameson did not tell Staton that Bruner needed emergency care.  Jameson understood that Staton was addressing the matter.  Jameson left the POD at 2:20 p.m.  Staton contacted Martinez about Bruner's condition and told him that mental health personnel had not yet arrived in the POD.  Martinez told Staton that he would again contact ConMed mental health personnel.  At approximately 2:45 p.m., Martinez contacted Skelton.  Martinez told Skelton of Bruner's behavior and asked to have someone check on him.

At approximately 3:00 p.m. on March 10, Armstrong and Skelton arrived at Bruner's cell. Skelton testified that it was not immediately obvious to her that Bruner needed medical attention, but that after a quick assessment, she thought that Bruner appeared to be "very sick" and in need of medical attention.  Bruner was very sweaty, lethargic, weak, warm to the touch, disoriented and unresponsive to cues.  Bruner was sitting on his bunk with his knees up and he was hunched over. Armstrong had to physically pick up his head to check his pupils.  Staton reported to Skelton that Bruner had been unresponsive for a few hours and that they were not sure if he was having symptoms of a mental or a medical problem.  Armstrong and Skelton thought that it was obvious that the physician assistant needed to evaluate Bruner immediately.  Armstrong went to the POD booth, called the clinic and requested that someone bring a wheelchair immediately to pick up Bruner so the physician assistant could evaluate him.  Deputies brought a wheelchair, put Bruner into the chair and took him to the medical clinic at the Sedgwick Jail.

When Bruner arrived at the clinic, Tina Glass, LPN, evaluated him.  She took his vitals and noted that he was unalert, unresponsive to painful stimuli and unable to ambulate.  She noted his history of Hepatitis C, cirrhosis of the liver and possible tuberculosis.  She further noted moderate skin jaundice, warm skin, turgor and slow capillary refills.  Glass testified that Bruner looked like he was not feeling good, but he did not look like he needed to go to the hospital immediately.  She notified Charles Fletcher, a ConMed physician assistant, who saw Bruner.  Fletcher gave verbal

orders to set up an IV, draw labs and test Bruner's stool for blood.  Fletcher testified that when he first saw Bruner in the clinic, he did not believe that Bruner's life was in danger if he did not receive immediate treatment.  Labs were drawn at 4:10 p.m.

At 5:20 p.m., Sharon Nelson, a registered nurse for some 40 years, saw Bruner and noted his condition.  At 5:30 p.m., Fletcher saw Bruner, conducted a rectal exam and noted his condition. Minutes later, Fletcher ordered IV fluids.  Fletcher testified that he suspected Bruner was experiencing liver failure, and that fluids would help him.  Between 6:00 p.m. and 6:50 p.m., Nelson saw Bruner two additional times and noted her observations and actions.  Nelson testified that during her observations of Bruner from 4:00 p.m. to approximately 9:00 p.m., she never asked Fletcher about immediately taking Bruner to the hospital.

At approximately 9:01 p.m., Fletcher reviewed the lab results and noted that Bruner's white blood cell count was high.  Fletcher testified that before he received the lab results, he did not believe that Bruner had an emergency condition which needed to be treated at a hospital.  Fletcher ordered IV antibiotics and to transfer Bruner to a local hospital.  At 9:39 p.m., EMS personnel transported Bruner to the hospital.

Two days later, on March 12, 2008, Bruner died in the hospital.  Plaintiffs' forensic pathology expert, Dr. Werner Spitz, opined that as a result of untreated cirrhosis of the liver, Bruner suffered a prolonged process of dying, which included brain swelling. Bruner's brain swelling manifested through physical symptoms such as difficulty walking, confusion and inability to eat. These symptoms began on March 5 and progressed until he died on March 12.[3]  When medical

---

[3]     As a result of liver cirrhosis, toxic substances accumulated in Bruner's liver and blood which significantly suppressed his immune system.  As his brain swelled, the brain stem was compressed and pushed onto the respiratory center, causing difficulty breathing.  As a result of his impaired breathing, Bruner developed meningitis.  The meningitis caused an infection in the lungs that eventually percolated to the brain. Bruner's brain swelling ultimately led to herniation of the
(continued...)

personnel gave Bruner antibiotics at approximately 9:20 p.m. on March 10, it was too late to prevent

his death.

## **Analysis**

### I.      **Weight Of Evidence**

Plaintiffs argue that the jury verdict was against the great weight of the evidence.  A motion

for new trial on the grounds that the jury verdict is against the weight of the evidence normally

involves a review of the facts presented at trial.  Welch v. Cabelka, 301 Fed. Appx. 825, 829 (10th

Cir. 2008).  Even if the Court does not necessarily agree with the jury verdict, the Court must uphold

it unless the moving party meets the heavy burden of showing that it is "clearly, decidedly or

overwhelmingly against the weight of the evidence."  Id.; Escue v. N. Okla. Coll., 450 F.3d 1146,

1156-57 (10th Cir. 2006); Blanke v. Alexander, 152 F.3d 1224, 1236 (10th Cir. 1998).

Prison officials violate the Eighth Amendment when they are deliberately indifferent to an

inmate's serious medical needs.  See Estelle v. Gamble, 429 U.S. 97, 104 (1976); Ramos v. Lamm,

639 F.2d 559, 575 (10th Cir. 1980), cert. denied, 450 U.S. 1041 (1981).  Deliberate indifference may

be proven by showing that prison officials intentionally denied, delayed access to or interfered with

an inmate's necessary medical care.  See Estelle, 429 U.S. at 104-05; Jones v. Hannigan, 959 F.

Supp. 1400, 1406 (D. Kan. 1997); see also Farmer v. Brennan, 511 U.S. 825, 835-37 (1994) (prison

officials act with deliberate indifference to inmate's health if they know that he faces substantial risk

of serious harm, and disregard that risk by failing to take reasonable measures to abate it).

The test for deliberate indifference includes both an objective and a subjective component.

---

[3](...continued)
brain stem, which was fatal.
            Plaintiffs' infectious disease expert, Dr. Steven Hosea, opined that Bruner had exhibited
symptoms of pneumococcal meningitis for some period before his death.  Dr. Hosea testified,
however, that the first signs of meningitis can be quite general and may consist of headache, high
fever, fatigue and irritability or signs of a common cold or flu.

Sealock v. Colorado, 218 F.3d 1205, 1209 (10th Cir. 2000).  The Court instructed the jury as follows:

> To establish her claim as to each defendant, plaintiff must prove that each of the following elements is more probably true than not true:
>
> 1.   By 7:00 a.m. on March 10, 2008, Terry Bruner had a serious medical need;
>
> 2.   Defendant knew of a substantial risk that Mr. Bruner had a serious medical need;
>
> 3.   Defendant consciously disregarded that risk by failing to take reasonable measures to address it; and
>
> 4.   Defendant's actions injured Terry Bruner.
>
> As to the second element, if you find that defendant refused to verify underlying facts that he or she strongly suspected to be true, or declined to confirm information about a risk that he or she strongly suspected to exist, you may conclude that defendant actually knew of a risk that Mr. Bruner had a serious medical need.  Also, if you find that Mr. Bruner's risk of a serious medical need was obvious, you may – but are not required to – conclude that defendant actually knew of that risk.  On the other hand, you may find that defendant was not aware of a risk, even where it was obvious, or that defendant knew of the underlying facts but believed (although incorrectly) that Mr. Bruner did not have a serious medical need.  In that event, you should not find that defendant had the required knowledge under the second element.

Instructions To The Jury (Doc. #426) filed March 5, 2012, Instruction No. 12.

At trial, defendants stipulated that in light of Bruner's death, plaintiffs could satisfy the first element, that is the objective component.  Defendants vigorously disputed the second and third elements, which comprise the subjective component.  Under the subjective component, the relevant question is "were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?"  Mata v. Saiz, 427 F.3d 745, 753 (10th Cir. 2005).  The prison official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he or she must also actually draw the inference.  Farmer, 511 U.S. at 837.

Plaintiffs presented persuasive evidence that Staton and Jameson had constructive notice that Bruner was ill, but such notice does not establish that defendants did not honestly believe that

-8-

Bruner had a non-emergent, mental health condition.  See Farmer, 511 U.S. at 838 (official's failure to alleviate significant risk that he should have perceived but did not, while no cause for commendation, cannot be condemned as infliction of punishment).  The subjective component is not satisfied by proof of negligence or constructive notice of medical need.  See id. at 835, 841. Plaintiffs also presented evidence that the risk to Bruner was obvious, but such evidence was not so overwhelming that a jury could only find that Staton and Jameson subjectively knew of the substantial risk of harm.   An obvious risk cannot conclusively show that a prison official subjectively knew of the substantial risk of harm because a prison official may show that the obvious escaped him or her.  Id. at 843 n.8.  Both defendants testified that they did not know that Bruner needed immediate medical treatment and that they suspected he had a mental condition.  While jurors could have reasonably disbelieved such testimony, they apparently found the testimony credible in light of all of the evidence.[4]

The jury verdict ultimately reflected a credibility judgment as to what Staton and Jameson understood about Bruner's condition on March 10 and the risks associated with his condition.  To

_____

[4]    In addition to the testimony of defendants, several officers and medical personnel testified that they did not understand that Bruner needed immediate treatment.  Cook, the POD 1 deputy on March 9, noted that Bruner was not eating, but he testified that did not believe that Bruner needed medical care or had any kind of emergency medical condition.  Murphy, a roving deputy who helped Jameson put Bruner back in his cell the morning of March 10, testified that he believed that Bruner had a mental health condition and did not need emergency care from a medical provider. When Armstrong and Skelton arrived at approximately 3:00 p.m., they recognized the need for a physician assistant to evaluate Bruner, but they did not call a Code 1 emergency for immediate medical attention.  Armstrong stated in her report that when she arrived, she was not sure whether Bruner had a true mental health issue or a medical issue, but that she decided to have medical staff clear him first.  Glass, who made an initial assessment in the clinc, testified that Bruner looked like he was not feeling good, but he did not look like he needed to go to the hospital immediately. Nelson, a registered nurse for some 40 years, testified that during her observations of Bruner from 4:00 p.m. to approximately 9:00 p.m., she never asked Fletcher about immediately taking Bruner to the hospital.  Fletcher, the physician assistant, testified that when he first saw defendant in the clinic, he did not believe that Bruner's life was in danger if he did not receive immediate treatment. Fletcher also testified that he did not realize the severity of Bruner's condition and the need for immediate medical treatment until he received the lab results at 9:00 p.m.

reach its verdict, the jury relied primarily on circumstantial evidence of defendants' knowledge. See Garrett v. Stratman, 254 F.3d 946, 950 (10th Cir. 2001) (whether prison official had requisite knowledge of substantial risk is question of fact subject to demonstration in usual ways, including inference from circumstantial evidence); 1 W. LaFave & A. Scott, Substantive Criminal Law § 3.7, at 335 (1986) (if risk is obvious, so that reasonable man would realize it, court might well infer that defendant did in fact realize it; but inference cannot be conclusive, for people are not always conscious of what reasonable people would be conscious of).  The Court cannot grant a new trial simply because it may have reached a different conclusion.  The trial certainly revealed significant and tragic shortcomings in training and procedure at the Sedgwick Jail and the ConMed clinic, but the jury verdict in favor of Staton and Jameson on the claim of deliberate indifference was not "clearly, decidedly or overwhelmingly against the weight of the evidence." Welch, 301 Fed. Appx. at 829; Escue, 450 F.3d at 1156-57.  The Court therefore overrules plaintiffs' motion for new trial based on the weight of the evidence.[5]

## II.    Exclusion Of Certain Medical Records And Autopsy Reports

Plaintiffs argue that the Court abused its discretion in precluding plaintiffs "from introducing the entire medical records and autopsy report into evidence."  Plaintiffs' Motion For New Trial (Doc. #428) at 25.  Without reference to any specific exhibit, plaintiffs argue that the Court excluded

---

[5]       At side bar after the jury had recessed for the day during the testimony of Staton, the Court informed counsel that defendants should not be comforted by the Court's earlier comment that it would likely set aside a punitive damage award in the range of $50 million. The Court commented that after hearing the evidence, Sedgwick County, the party that agreed to indemnify Staton and Jameson, should understand that despite the Court's prior comment, if a jury returned a verdict in favor of plaintiff, the Court would not likely set it aside or reduce it based on the amount of the verdict. While the Court gave its candid opinion at that point in the trial, it did not intend to suggest that a verdict in favor of defendants would be "clearly, decidedly or overwhelmingly against the weight of the evidence."  Welch, 301 Fed. Appx. at 829.  The Court merely intended to inform Sedgwick County that it should not assume that a defense verdict was a foregone conclusion or that a jury would not return a sizeable award that the Court would uphold.

medical records which reflect that Bruner had been transported back to Sedgwick Jail "for decreased mental status," that he had stopped eating two days prior to his death, that he reportedly felt ill, that he "walked under his own power" to the jail Clinic and that Fletcher allegedly did not discover that Bruner "had decompensated with a decreased level of consciousness and was essentially non-responsive" until after he reviewed Bruner's labs. Id. at 19-20.

The Court assumes that plaintiffs are referring to various documents within Exhibit 4. Near the end of trial, counsel raised this issue and the Court admitted the disputed portions of Exhibit 4.[6] The Court does not recall sustaining any of defendant's objections to Exhibit 4. Before the Court had ruled on all of the objections, however, plaintiffs' counsel withdrew the remaining documents including the autopsy report which involved similar hearsay objections. In effect, plaintiffs' counsel stated that the remaining documents merely showed the same things and that it was not necessary to go through them in light of the Court's ruling admitting the first few documents. Plaintiffs have not shown that the Court excluded any portion of the medical records and autopsy reports. Accordingly, the Court overrules plaintiffs' motion for new trial on this ground.

## III.    Refusal To Strike Juror Jody Haugen

Plaintiffs argue that the Court erred by refusing to strike for cause juror Jody Haugen

---

[6]    See "Death Summary" (p. 6 of Exhibit 4) (patient admitted from Sedgwick County jail for decreased level of consciousness; patient was reported as having two to three days of not feeling well with decreased appetite; on day of admission, was less than responsive; by time he arrived at ER, was completely unresponsive); "History And Physical" (p. 8 of Exhibit 4) (patient transported back to Sedgwick jail for decreased mental status; apparently two days ago, he stopped eating, reportedly felt ill; reported that he walked under his own power into the clinic; PA reported that after he reviewed labs and went to see patient, patient had decompensated with decreased level of consciousness and was essentially non-responsive); "Via Christi Adult Medicine History And Physical Examination" (p. 35 of Exhibit 4) (transferred from Sedgwick County jail for decreased mental status; patient reportedly had been feeling ill for several days; two days ago stopped eating; walked into clinic; seen by PA); "Consultation" (p. 37 of Exhibit 4) (patient transferred back from Sedgwick County Jail for decreased mental status, seems he had been feeling not well and ill for last few days with questionable fever and chills, recently stopped eating and went to clinic).

"despite her admitted bias in favor" of the two correctional deputies after being exposed to pretrial publicity.  See Plaintiffs' Motion For New Trial (Doc. #428) at 26.  The Court must grant a challenge for cause if a prospective juror shows actual prejudice or bias.  Vasey v. Martin Marietta Corp., 29 F.3d 1460, 1467 (10th Cir. 1994).  Actual bias is shown by the juror's admission of bias or "by proof of specific facts which show the juror has such a close connection to the facts at trial that bias is presumed."  Id.

In response to questions from the Court, Ms. Haugen stated that she thought that she could put aside the TV reports and newspaper articles, follow the Court's instructions and decide the case based solely on the evidence admitted at trial.  In response to questions from plaintiffs' counsel, Ms. Haugen stated that based solely on TV reports and reading about the case in the newspaper, she was "somewhat" slanted in favor of the governmental entity because of the number of inmates at the facility.  After defense counsel and the Court inquired further, however, Ms. Haugen clearly stated that she thought that she could put aside her initial impressions based on news reports, follow the Court's instructions and decide the case based solely on the evidence admitted at trial.  Based on these responses, the Court did not err by refusing to strike Ms. Haugen for cause.

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion For New Trial (Doc. #428) filed April 3, 2012 be and hereby is **OVERRULED**.

Dated this 8th day of January, 2013 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge